# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOSEPH WAYNE EASTRIDGE,** *et al.*,  ) | |
| ) | |
| **Petitioners,**  ) | |
| ) | |
| **v.**  ) | **Civil Action No. 00-3045 (RMC)** |
| ) | |
| **UNITED STATES OF AMERICA,**  ) | |
| ) | |
| **Respondent.**  ) | |

## MEMORANDUM OPINION

In January 1976, Michael A. Diamen, Joseph W. Eastridge, Stephen C. Jones, and

Joseph N. Sousa were convicted in the Superior Court of the District of Columbia of first-degree

murder, while armed, for the stabbing death of Johnnie Battle.   A fifth co-defendant, Richard C.

Richter, was convicted of assault.[1]  The Government's theory of the case at trial was that a group

associated with a motorcycle gang, the Pagans, was involved in a racially-charged confrontation with

three Black men, including Mr. Battle, outside the Godfather Lounge ("Godfather") in Washington,

DC.[2]  After a series of verbal exchanges, Mr. Battle retrieved a handgun from his car and fired into

the group, wounding one of the Pagans.  Mr. Battle fled on foot down Wisconsin Avenue.  Messrs.

Jones, Diamen, Eastridge, and Sousa allegedly "gave chase, with their knives drawn, chasing . . . Mr.

Johnnie Battle up to Wisconsin Avenue, across Wisconsin Avenue, where Mr. Battle is seen tripping

---

[1]  Two counts of the five count indictment applied to Messrs. Sousa, Eastridge, Jones, and
Diamen: 1) Murder in the First Degree While Armed, which charged them with using a knife to
"purposely and with deliberate and premeditated malice" kill Mr. Battle; and 2) Murder in the
First Degree, which charged them with "stabbing [Mr. Battle] with a knife, thereby causing
injuries" that resulted in Mr. Battle's death.  Trial Tr. at 59-60.  The remaining three counts
pertained only to Mr. Richter.

[2]  The men and women in the Pagan group were White.

on a curb, falling backwards, with his arms up, and being stabbed repeatedly by these four defendants . . . ." Trial Tr. at 64.

After numerous unsuccessful appeals and post-trial motions, Messrs. Eastridge and Sousa ("Petitioners")[3] filed a Petition for Habeas Corpus pursuant to 28 U.S.C. § 2241, asking this Court to vacate their murder convictions.[4] In April 2005, a Supplemental Petition was filed to allege a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) based on the failure of the prosecutor to release allegedly-exculpatory evidence. Mr. Jones is not part of this litigation and did not appeal his sentence. The Petition is supported by new evidence unearthed by Centurion Ministries, a non-profit prisoner-advocacy center, during an eight-year investigation of the case.[5]

Illuminated by the light of this new evidence, the fog has lifted. Mr. Jones and unindicted members of the Pagans murdered Mr. Battle. Based on the full record, no reasonable juror would now find Petitioners guilty beyond a reasonable doubt. The Court finds that this is the rare case in which Petitioners can prove their "actual innocence" of the crime charged as well as violations of their constitutional rights at trial. The Petition will be granted and the parties directed to confer on an appropriate order.[6]

---

[3] Mr. Diamen, a co-petitioner at the time initial briefing was completed, passed away on December 9, 2002. As a result, the habeas record and briefs do not focus on him. Presumably, the same analysis would apply.

[4] They assert that they were wrongfully convicted of murder as a result of (1) the trial court's limitations on their right to introduce evidence; (2) the prosecutor's use of race-based peremptory challenges; (3) the failure of the prosecution to release exculpatory evidence; and (4) defense counsel's ineffective assistance.

[5] The Court extends its gratitude to Centurion Ministries and to Wilmer Cutler Pickering Hale and Dorr, LLP for their extraordinary work on this matter for almost two decades.

[6] The case was assigned by the Calendar Committee to the undersigned in January 2003.

I.    **FINDINGS: WHAT REALLY HAPPENED**

Upon consideration of the extensive trial record, supplementary documents and exhibits submitted with the Petition, the testimony received during an evidentiary hearing in December 2004 ("2004 Hearing"), the Court's analysis of the demeanor and candor of the witnesses, and the parties' briefs, the Court makes the following findings.[7]

1.    A club of Pagans gathered at the home of its president, Richard Richter, in Arlington, VA, on November 1, 1974, to celebrate Mr. Richter's birthday.[8]  Club members in attendance were Steven Jones, who had just been initiated into the Pagans, and his girlfriend, Pamela Heim; Chesley Barber; Charles Jennings; John Wood; Tommy Greenwood; Bruce Hunter; Jill Summers; Michael Diamen; and Petitioners Eastridge and Sousa.

2.    The party moved to a local bar known as "JJ's," where some members of the club became involved in a fight.  Mr. Jones allegedly cut his hand during the fight.  The group quickly left JJ's and, after a brief stop at Mr. Richter's house, traveled into the District of Columbia to visit the Godfather, a lounge on Wisconsin Avenue N.W.

---

[7] An idea of the street layout may assist the reader in following the facts.  Most of the streets in Washington, DC run north-south or east-west in a grid; streets named after the States, like Wisconsin Avenue, dissect the grid at an angle.  The events in question took place on Wisconsin Avenue N.W., around Fessenden Street (running east-west), Emery Place (running east-west), and Ellicott Street (running east-west).  42nd Street runs north-south and runs into Wisconsin Avenue at a sharp angle.  Emery Place (between Fessenden and Ellicott) runs into 42nd Street at the place where 42nd and Wisconsin intersect.  Therefore, one can drive south on Wisconsin Avenue, turn sharply left at the corner of Wisconsin and 42nd and immediately enter Emery Place.

[8] Except where noted, the following recitation of the events of that evening are accepted by all parties, including the United States, as the most reasonable interpretation of the entire record.

3.     The Pagans traveled in two cars.  The first car belonged to Mr. Richter and contained Ms. Heim and Mr. Jones, Tommy Greenwood, Jill Summers, Bruce Hunter, and Mr. Richter.  Trial Tr. at 1733 (Heim).  The second car, a green Plymouth, belonged to Mr. Eastridge and contained Messrs. Eastridge, Sousa, Diamen, Barber, Jennings, and Wood.  *Id.* at 1734.  Because Mr. Eastridge had been drinking too heavily to drive, Mr. Sousa drove his vehicle.  The two cars parked on Fessenden Street, around the corner from the Godfather.

4.     The Pagans were not welcomed at the Godfather.  They entered and went to the lower level but, upon instructions from the bar's owner, Tommie Motlagh, bouncer Stephen Mathers told them they would not be served and should leave.

5.     As the Pagans were climbing the steps to leave, they encountered three Black men, Johnnie Battle, Armon Allen, and Joseph Brown.  Mr. Richter challenged Messrs. Battle and Brown on whether they had called him a nasty name.  Both men denied having done so, and the two groups left the Godfather, with the Pagans trailing Mr. Battle and his friends out of the doorway and then north and west onto Fessenden Street, where both parties had left their cars.

6.     Along the way, Mr. Allen became separated from his friends and had an altercation with Mr. Richter, who thought Mr. Allen had a knife and who pulled out his own knife.  Mr. Richter stepped toward Mr. Allen with his knife drawn.  After realizing that Mr. Allen was holding a comb, he stepped back, put his knife away, and continued toward his vehicle.

7.     Fearing for Mr. Allen's safety, however, Mr. Battle went to his car and retrieved a gun.  With Mr. Brown, he then headed back to the corner of Fessenden and Wisconsin, where they had last seen Mr. Allen.  As they did so, they encountered the group of Pagans.  Mr. Jones threw popcorn at Mr. Battle and said, "Monkeys don't like popcorn?"

-4-

8.      Mr. Brown put his head down to avoid looking at the Pagans and kept on moving. When he looked back, Mr. Battle was surrounded by the Pagans, who were holding knives.

9.      Mr. Battle raised his gun and shot into the group of Pagans, striking Bruce Hunter. Mr. Brown ran to the Godfather.  "Just before I went in there, I took a glance . . . and saw [Mr. Battle] running with the gun and the group of guys behind him with knives."  Trial Tr. at 139 (Brown).  Mr. Allen also heard the gunfire and ran toward the Godfather.  He looked to the corner and "it looked like seven or eight people swung around the corner altogether.  I didn't know what it was.  So, I just stepped inside the door."  Trial Tr. at 105 (Allen).

10.     Later on, both men could recognize Messrs. Eastridge, Sousa, Diamen, and Jones as having been among the Pagans but could not identify who chased Mr. Battle.

11.     Mr. Battle ran toward Wisconsin Avenue but did not go to the Godfather.  He crossed Wisconsin at an angle and ran south on the sidewalk to where 42nd Street and Emery Place intersect Wisconsin.  He ran east on Emery Place for half a block and turned south again down an alley.

12.     Mr. Jones followed Mr. Battle in hot pursuit.  A teenager, he was the youngest and fastest of the Pagans.  Mr. Jones and some other Pagans chased Mr. Battle south on Wisconsin Avenue, east on Emery Place, and then south down the alley.

13.     Mr. Jones caught up with Mr. Battle as he crossed Ellicott Street at the end of the alley and entered the driveway of the Roundtable Restaurant.  Mr. Battle stumbled, Mr. Jones caught his legs and tripped him, and then fell upon him, using his fists.  Two or more Pagans joined in the fight, using knives.

14.     In less time than it takes to tell, Mr. Battle suffered seventeen knife wounds and was dead.

15.     Mr. Jones and one other Pagan leapt off of Mr. Battle and raced back up the alley, going north. As they ran, the other Pagan threw his knife into a backyard. The two men separated and Mr. Jones encountered Mr. Sousa driving the green Plymouth, inside of which were Messrs. Eastridge and Diamen.

16.     Two other Pagans ran in another direction and returned on foot to Virginia.

17.     In response to Mr. Battle's gun shots, Mr. Eastridge first ran west on Fessenden Street, away from Wisconsin Avenue, thinking to hide in an alley. When he realized that Mr. Battle was being chased toward Wisconsin Avenue, he followed. He rounded the corner of Fessenden and Wisconsin and headed south on Wisconsin for a short distance. He saw the chase cross Wisconsin and head onto Emery Place. He then turned around and ran back north on Wisconsin Avenue.

18.     When Mr. Eastridge had almost gotten back to Fessenden, he saw Mr. Sousa round the corner in the car and climbed in. Mr. Eastridge had been drinking from his own bottle of whiskey and carried it with him as he ran.

19.     Mr. Sousa ducked down behind the Plymouth when the shots were fired. When he straightened up, he saw Mr. Richter assist Mr. Hunter into Mr. Richter's car and drive off, turning at the corner to go south on Wisconsin Avenue.[9] He hopped into the green Plymouth and pulled out, heading toward Wisconsin.

20.     Before reaching the corner, Mr. Sousa paused to pick up Mr. Diamen. As he rounded the corner, going south on Wisconsin, he saw and picked up Mr. Eastridge, who got into the back seat.

_____

[9] Ms. Heim drove the Richter car, with the wounded Bruce Hunter, Messrs. Richter and Greenwood, and Ms. Summers as passengers.

21.    The United States agrees that the above recitation constitutes the most reasonable reading of the entire record of evidence.  At oral argument after the 2004 Hearing, the United States stated:

> AUSA:  A reasonable inference, a reasonable interpretation of what happened is as follows.  That after Hunter was shot, Sousa was at his car, Eastridge was as well at his car that Sousa was driving.  Eastridge began to run around the corner and follow where Jones and the whole group was [going] and went across Wisconsin Avenue . . . .  Mr. Eastridge got to a certain point where just a little bit past the corner and turned around.  He could have been running back up to Mr. Sousa's car.  Then got into Mr. Sousa's car and they did make a left on Ellicott just as Motlagh saw them.
>
> THE COURT: So Mr. Sousa stayed at the car and got in it.
>
> AUSA: While he was getting in the car.
>
> THE COURT: Right.
>
> AUSA: Mr. Eastridge was running to the car.
>
> THE COURT: Right.  So Mr. Eastridge was running toward the corner.  Mr. Sousa got in the car.  Mr. Sousa started up the car towards Wisconsin Avenue, and encountered Mr. [Diamen] on the street or on the sidewalk or wherever and picked him up.
>
> AUSA: Correct.
>
> THE COURT: And then rounded the corner and at that point they encountered Mr. Eastridge who had run partway down the street, down Wisconsin Avenue, and turned around and ran back again and they picked up Mr. Eastridge.
>
> AUSA: Yes, your Honor, that's what the Government can conclude from the evidence from the testimony of the witnesses as [a] reasonable inference of what happened.

Oral Argument 4/8/05 at 22-23.

22.     The most reasonable interpretation of all the evidence is that Petitioners did not chase Mr. Battle and did not participate directly in murdering him.

23.     The Plymouth then drove south on Wisconsin Avenue and made a sharp left at the intersection of Wisconsin, 42nd Street and Emery Place, where Mr. Eastridge had seen the chase headed.  They drove east on Emery to 41st Street, turned left and went north on 41st to Fessenden, and turned left again, completing a square as they came to the intersection of Fessenden and Wisconsin.   The United States disputes this finding.

24.     Along the way, they found Mr. Jones, who had run up the alley from Ellicott Street, on either Emery or Fessenden and stopped to pick him up.   Mr. Jones's hands were bloody and Mr. Eastridge handed him some newspaper to wipe them.

25.     The most reasonable interpretation of all the evidence is that Petitioners did not turn into Ellicott Street, the site of the murder, and did not aid and abet others in murdering Mr. Battle, although they attempted to assist Mr. Jones to escape.  The United States disputes this finding.

26.     As they reached Wisconsin and looked south toward the Godfather, the Pagans could see a police car.  They turned right, going north.

27.     The green Plymouth was seen and identified by Mr. Motlagh, who had come outside upon hearing gunshots and had told someone to call the police.  Mr. Motlagh identified it as the second car that he had seen driving down Wisconsin (the first being the Richter car).

28.     The responding police officer followed the green Plymouth north on Wisconsin Avenue.  He stopped the car and noticed a Jim Beam whiskey bottle on the floor between Mr. Eastridge's legs.  Another officer brought Mr. Motlagh to the stopped car, and Mr. Motlagh identified the occupants as among those who had recently left the Godfather.

29.     Blood was found in the left back seat of the car and the back of the left front seat, near where Mr. Jones had been seated.  Bloody newspapers were found in the back seat, again near where Mr. Jones had been seated.

30.     A dusty knife was found under the seat where Mr. Sousa had been seated.  A small knife was recovered from Mr. Eastridge.  A knife in its sheath was also recovered from Mr. Jones. The following day, a knife was found near a grassy area along Wisconsin Avenue where Mr. Diamen had allegedly sat while waiting to be processed by the police.  None of these knives had blood on them.

31.     A Puma knife with some signs of blood, which fit a knife sheath found near where Mr. Richter's car had been parked on Fessenden Street, was recovered from a backyard halfway up the alley between Ellicott Street, the site of the murder, and Emery Place.

32.     Mr. Jones had severe cuts on his hands and his clothing was soaked in blood.[10]  Mr. Diamen's own blood was found near a tear in his pants; no other blood was found on his person or clothing.  Mr. Sousa had blood on his shirt in an amount too small to type; no other blood was found on his person or clothing.  No blood was found on Mr. Eastridge.

Petitioners were sentenced to twenty years to life.  Mr. Sousa served nineteen years in jail before being released on parole;  Mr. Eastridge served twenty-nine years before being released on parole.  The terms of their paroles include significant restrictions.  They served this time as convicted murderers for a crime which it is more likely than not that no reasonable juror, based on the full evidentiary record, would find them guilty beyond a reasonable doubt.

_____

[10]  Blood was found on Mr. Jones's jeans-jacket and boots, and had soaked through his jeans to his longjohns.  Trial Tr. at 544-61.

## II.    LEGAL STANDARDS

The writ of habeas corpus is a remedy of common law origin that protects individuals against arbitrary and wrongful imprisonment by permitting a judicial challenge to the legality of detention.  *See McNally v. Hill*, 293 U.S. 131, 136-37 (1934).  The writ is constitutionally recognized: "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it."  U.S. CONST. art. 1, § 9, cl. 2.  Through the Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 73 (1789), and the Habeas Act of 1867, Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385 (codified as 28 U.S.C. §§ 2241-55 (1976)), Congress statutorily authorized such a remedy for both state and federal prisoners.

Permitting challenges to the validity of imprisonment is not without costs and may pose a threat to principles of finality and comity.  *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (the costs of a habeas petition are more extreme where a claim is first presented in a "second or subsequent" petition); *Murray v. Carrier*, 477 U.S. 478, 487 (1986) (petitions may interfere with a State's sovereign power to punish offenders and efforts to honor constitutional rights).  Repeat habeas claims, in particular, can slow the administration of justice and impose a financial burden on the judicial system.  Accordingly, Congress has limited the availability of the writ and fashioned rules disfavoring repetitious petitions.  *See Kuhlmann v. Wilson*, 477 U.S. 436, 450 (1986) (Congress amended 28 U.S.C. § 2244(b) to encourage finality in judgments).

While the Supreme Court has acknowledged such limitations on successive and abusive petitions, *see id*. at 444 n.6, its decisions are tempered by an abiding appreciation for "the equitable nature of habeas corpus" which precludes the "application of strict rules of res judicata." *Schlup v. Delo*, 513 U.S. 298, 319 (1995).  *See also Fay v. Noia*, 372 U.S. 391, 438 (1963) (habeas

corpus traditionally governed by equitable principles). These decisions have measured "the limited circumstances under which the interests of the prisoner in relitigating constitutional claims held meritless on a prior petition may outweigh the countervailing interests served by according finality to the prior judgment." *Kuhlmann*, 477 U.S. at 452 (justice requires "federal courts to entertain such petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence").

In *Schlup*, the Supreme Court refined the "miscarriage of justice" exception to restrictions on successive review of habeas claims, "seek[ing] to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." 513 U.S. at 324. Where a habeas petition is otherwise barred, a petitioner may obtain habeas relief if "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id*. at 327 (quoting *Carrier*, 477 U.S. at 496).

To establish "actual innocence" that overcomes the presumption of guilt that attaches after trial and conviction, a petitioner must produce "new reliable evidence . . . that was not presented at trial," *id*. at 324, and demonstrate that, in light of all the evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *id*. at 327. The "actual innocence" inquiry is properly informed by all the evidence, including "relevant evidence that was either excluded or unavailable at trial." *Id*. at 327-28. *See Bousley v. United States,* 523 U.S. 614, 631-32 (1998) (under *Schlup*, "new evidence" is to be evaluated along with the "old evidence" consisting of the transcript of the trial). Notably, the reviewing court is not bound by the rules of admissibility that govern at trial and is empowered to make credibility determinations

retrospectively. *Id.* at 327. After reviewing the totality of the evidence, the court must make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329.

However, *Schlup* also instructs that a colorable showing of innocence alone is insufficient grounds for vacating a conviction. Rather, this showing must be accompanied by an independent claim that a constitutional error occurred at trial. Specifically, a successive habeas petitioner may effectively challenge his conviction by demonstrating that, in light of the new evidence, a constitutional error at trial "probably resulted" in his conviction. *Id.* at 326-27.

Petitioners assert that an evidentiary Rule imposed by the trial judge violated their Fifth Amendment due process right to present "evidence that someone other than [themselves] committed the charged crimes," *Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1989), and their Sixth Amendment right to confront and cross-examine all Government witnesses against them, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Under the Rule, "no lawyer was to ask questions that would inculpate or exculpate any other defendant unless he cleared it with the defense attorney." Trial Tr. at 601 (Judge). Petitioners' lawyers were barred from making arguments or introducing evidence through direct or cross-examination that could "bring into play any other defendant." Voir Dire Tr. at 150 (regarding oral argument). *Accord* Trial Tr. at 601 (regarding testimony).[11]

The Rule had a real impact on the trial. When Mr. Eastridge's post-trial motion alleging ineffective assistance of counsel was denied, the judge explained:

---

[11] The trial transcript for the hearing in which the court first imposed the Rule is missing. As a result, it is impossible to determine with certainty how the Rule originally came to be imposed.

> The second reason for ruling the cross-examination does not reach the level of gross incompetence pertains to the court's *severe restriction regarding cross-examination at the trial*. In an effort to prevent prejudice to the four codefendants, the court ruled prior to trial that no defense counsel could cross-examine a witness so as to inculpate or exculpate any other defendant unless the cross-examination was cleared first with that defendant's counsel. *See* Trial Transcript, pages 601, 1799, 1802, 2276-77.
>
> In fairness to trial counsel, this ruling made it very difficult to cross-examine Mrs. Willetts on this incident without further implicating codefendant Sousa in the crime. Indeed, the rule proved so restrictive to Sousa's attorney that he did not even attempt any cross-examination of a witness whose sworn testimony was very damaging to his client. (Trial Transcript, page 1691.)

*United States v. Eastridge*, 110 Wash. L. Rep. 1181, 1187 (1982) (emphasis added). In this Court, Petitioners argue that the restrictions of the Rule were unconstitutional.

## III.    OVERVIEW OF 1975 TRIAL[12]

The defendants were tried in the winter of 1975. The prosecution theory was that Messrs. Jones, Eastridge, Sousa, and Diamen chased and stabbed Mr. Battle. *See* Trial Tr. 1098 (Laughery) ("One of the things that the Government is going to be proving in this case, attempting to prove, is that these four defendants ran after and struggled with and finally stabbed to death John[nie] Battle."). Prosecutors called a number of witnesses, including police officers, experts and eyewitnesses, and introduced into evidence numerous knives, blood evidence, and other physical items.

Joseph Brown and Armon Allen set the stage for the prosecution's case against the defendants by recounting the details of the evening of November 1, 1974, from their perspectives, as described above.

---

[12] The Court extends apologies to the reader, who will find it was necessary to repeat the basic facts more than once to illustrate evidentiary differences.

Pamela Heim described the encounter outside the Godfather and testified to hearing shots. When she saw Mr. Battle with a gun in his hand, Messrs. Sousa and Eastridge were standing next to their car, getting ready to get into it. *Id*. at 1757. After the shots, everyone scattered and she assisted the wounded man, Mr. Hunter, into Mr. Richter's car. *Id*. at 1759. Thereafter, Ms. Heim drove Mr. Richter, Mr. Greenwood, Ms. Summers, and Mr. Hunter to a hospital in Virginia, leaving seven men behind. *Id*. at 1760. Although the Eastridge/Sousa green Plymouth was on Fessenden Street when the Richter car drove away, Ms. Heim testified that she did not know what happened to Messrs. Diamen, Jones, Eastridge, or Sousa after the shots were fired. She did not testify to the whereabouts of Messrs. Barber, Jennings, and Wood. *Id*. at 1762.

Stephen Mathers was the doorman at the Godfather on November 1, 1974 and confirmed that the Pagan group consisted of ten to twelve persons.[13] Trial Tr. at 494-L. After hearing shots, Mr. Mathers watched as Mr. Battle ran by the Godfather entrance and continued south across Wisconsin Avenue. *Id*. at 425-26. Mr. Mathers could not state with certainty the number of persons chasing Mr. Battle. *See id*. at 427 (there were "[t]hree, four, maybe five people."). Although he was not able to identify the chasers, he stated that one carried a knife and some wore "Levi jackets and all. The crowd that we had just had inside." *Id*. at 427-28.[14]

Tommie Motlagh, the owner of the Godfather, was with Mr. Mathers at the entrance to the lounge. Mr. Motlagh heard shots from the direction of Fessenden Street and told someone

---

[13] At least part of Mr. Mathers's statement at trial was out of the presence of the jury and would not have been considered by the jurors in reaching a finding of guilt.

[14] Mr. Mathers noted that Mr. Battle and his chasers had run south on Wisconsin Avenue and appeared to "cut up the street and they were following right behind him." Trial Tr. at 444 (Mathers). He lost sight of the group after it passed a liquor store and could not be sure exactly where the group turned away from Wisconsin Avenue. *Id*. at 445.

to call the police. *Id*. at 494-X - 494-Y. "After I tell them to make a phone call, I saw Joe Brown

and his friend running down Wisconsin Avenue." *Id*. These two entered the Godfather. He then

"saw the third man running down the street and two men that were running behind him, and one of

them had the knife in his hand." *Id*. at 494-Z. These men ran down Wisconsin Avenue to the end

of the block and crossed Wisconsin. *Id*. Mr. Motlagh was able to describe one of the "two men"

chasing Mr. Battle with particularity. "One of them had dark hair, with a moustache and goatee, and

he had a tattoo on his arm, the one who had a knife in his hand." *Id*. at 494-Z - 495. "He had a white

T-shirt on and a black leather wrist [band] and the blue jeans." *Id*. at 495.[15]

Mr. Motlagh then noticed a car containing three-to-five people, including a few

women, drive down Wisconsin Avenue. After this first car drove away, a second car, an old green

Plymouth, turned southbound from Fessenden Street onto Wisconsin Avenue, in the direction of the

chasers. Mr. Motlagh's testimony established that there were multiple persons in this car. *Id*. at 495-

---

[15] After Mr. Motlagh testified before the jury, defense counsel argued that the prosecution had failed to produce exculpatory information as required under *Brady v. Maryland,* 373 U.S. 83, 87 (1963). The thrust of the argument was that, because Mr. Motlagh had testified that Mr. Richter was not one of the chasers and because he was able to describe at least one of the chasers with specificity, the prosecution should have known "it has someone who will say the person chasing this man down the street is not one of the five people on trial." Trial Tr. at 495-N. They argued that a "negative identification" was possible of the chaser described by Mr. Motlagh because he could state that the chaser he described in detail (with the goatee, tattoo, white T-shirt, and blue jeans) was, in fact, not one of the persons detained that night and placed on trial. *See id*. at 495-O.

In a *voir dire* outside the presence of the jury, Mr. Motlagh testified that, at the time of trial, he was not able to recognize the man he had seen running down the street with the knife. *Id*. at 495-T. However, he affirmed that when the police showed him the four defendants on the evening of the murder, "I did not recognize any of them. The one that had the knife in his hand, no." *Id*. at 495-U. It appears that the man he described fit the description of Mr. Barber. This testimony does not seem to have been repeated in front of the jury.

A - 495-B (stating variously that there were "two-three people in it" and "[t]hree or four guys"). This car "made a left turn at Ellicott." *Id*. at 495-A.

Stephen Maday was a patron of the Godfather on the night of November 1, 1974. After observing some of the initial non-violent encounter between the Pagans and the Black men, Mr. Maday crossed Wisconsin Avenue. From the other side of the street, he "saw approximately four to six individuals chasing one individual." Trial Tr. at 1825 (Maday). Thereafter, another "individual passed me, headed north on Wisconsin Avenue." *Id*. at 1826. This individual had "a whiskey type bottle" in his hand. *Id*. Unlike the others, the individual with the bottle was not running south, but was "jogging" north on Wisconsin. *Id*. at 1832, 1841. Mr. Maday said that this individual was not one of those who chased Johnnie Battle. *Id*. at 1832. The Government later admitted that the person with the whiskey bottle was Mr. Eastridge. *Id*. at 2790.

The prosecution produced only one witness who professed to have seen the attack.[16] David Brady worked and lived near the Godfather. On the evening of November 1, 1974, Mr. Brady and his girlfriend were getting into a car located on "42nd and Wisconsin Avenue – 42nd and Ellicott." Trial Tr. at 1177 (Brady).[17] Mr. Brady testified that he heard the verbal altercation between Messrs. Battle, Brown, and Allen and the Pagans and then saw one of the Black men running "across Wisconsin Avenue, through the park." *Id*. at 1179. A number of White men were

---

[16] It appears that defense counsel had concern about the credibility of this witness. They indicated that "this witness is a witness who appeared suddenly nearly a year after the incident" and may have testified to receive lenient treatment for a separate crime. Trial Tr. at 1187. In addition, they suggested that the witness had a reputation for dealing in guns and narcotics. *Id*. at 1195. In any event, Mr. Brady was not cross-examined.

[17] 42nd Street intersects Wisconsin at Emery Place, not Ellicott Street, so the exact location of this witness cannot be determined from the trial record.

chasing him southbound. Mr. Brady thought there were about four to six men chasing Mr. Battle. *Id*. at 1183. "Well, he got to Emery . . . and Wisconsin Avenue, as he was going onto the curb. And I seen, as he was falling, one of the white dudes was getting to him at that time." *Id*. at 1179. Mr. Brady described a fall, one of the chasers falling on top of the victim, and the other chasers joining in the melee. "Well he kicked his foot from underneath him, and at that time they had started getting him by that time. By that time, the rest of the guys had got to him by then." *Id*. at 1180. After the Pagans started to hit and knife Mr. Battle, Mr. Brady said he just drove away on Ellicott Street. *Id*. at 1183-84.

Mr. Motlagh waited for police outside the Godfather. Eugene Ur was the first officer to respond and Mr. Motlagh told him of the chase he had seen. He then saw the green Plymouth at the east side of the intersection of Wisconsin and Fessenden and told Officer Ur that it was the same car he had seen earlier. Officer Ur immediately gave chase and stopped the car on Wisconsin Avenue, north of Fessenden Street.

"Mr. Sousa was the operator of the vehicle. Mr. Diamen was sitting on the right front passenger seat. Mr. Jones was sitting directly behind the driver in the rear seat, and Mr. Eastridge was sitting on the – in the rear seat on the passenger side." Trial Tr. at 662 (Ur). Mr. Jones had "a newspaper in his hands and . . . he had cuts on his hands." *Id*. at 665. When Officer Ur looked inside the car, he found a knife and some blood in the area where Mr. Jones was seated. *Id*. at 667.

The defendants were secured and another officer asked Mr. Motlagh "if that's same people in the car . . . ?" Trial Tr. at 495-H (Motlagh). In response to this rather ambiguous question, Mr. Motlagh replied "Yes." *Id*. at 495-I. During examination, Mr. Motlagh clarified that the four

-17-

men that were in the car stopped by the police were simply four of the larger group of Pagans that had been at the Godfather earlier that night. *See id.* at 495-I ("The same people that left the Godfather, right."); *id.* at 495-J (affirming that they were "four of the people that [Mr. Motlagh] saw with Mr. Richter's party at the Godfather").[18]

John White and Ronald Eddie were the first to discover Mr. Battle's body at the entrance to the parking lot of the Roundtable Restaurant at the east side of the intersection of Wisconsin and Ellicott. The Roundtable Restaurant was located two blocks (250-300 yards) south of the Godfather on Wisconsin Avenue. Mr. Battle was badly bruised and had "bleeding around the face; also, bleeding on the chest, from what I could gather, and there was also a pool of blood coming from his head." Trial Tr. at 349 (White). His body was "bleeding profusely, because it was running that far, from the time we got there, from the head, all the way to the gutter of the street." *Id.* The bleeding was so extensive that, during the course of administering cardiopulmonary resuscitation, Mr. White's hands became covered with blood. "There were wounds on the body . . . . It seemed to be either his face was swollen to some nature . . . ." Trial Tr. at 373 (Eddie). Neither man observed anyone in the area at the time they discovered the body.

Police officers searched the defendants and the green Plymouth. Messrs. Eastridge and Jones possessed folding knives; Messrs. Sousa and Diamen had no weapons. Trial Tr. at 1066-69 (Villarreal). These knives had no blood stains and no signs that they were used in the attack against Mr. Battle. *See id.* at 1082-85 (acknowledging that the knife found on Mr. Jones had stains

---

[18] Police Sergeant Richard Scott testified that, after speaking with Mr. Motlagh, he asked "him if he could recognize anyone . . . ." and Mr. Motlagh answered, "That's the subjects that were chasing the negro [sic] male just a little earlier." Trial Tr. at 968 (Scott). On cross-examination, Sergeant Scott agreed that he asked Mr. Motlagh if "these were the same people in the car" and Mr. Motlagh had said yes. *Id.* at 1010.

-18-

but that they did not appear to be blood stains).  The police recovered various items from the green Plymouth, including "a partially full bottle of Jim Beam whiskey from the rear floor of the auto," "a hunting knife from the – beneath the front seat, on the driver's side,"[19] and "a piece of newspaper from the rear floor of the car."  Trial Tr. at 1214 (McGinnis).  The defendants' clothing and personal effects were also secured.

A local resident, who lived on Wisconsin Street between Ellicott Street and Emery Place, discovered a knife on the back steps of her house the day after the murder.  This knife was bloody with "three little dents in it to hold your hand in.  It was a ridgey-edge knife, and it had a point on the end, and it was quite thick, about twelve inches long, I would say."  Trial Tr. at 1455 (Cleary).  The police report listed it as a "hunting knife," a "Bowie Knife, brand name Puma, and was about a 10" blade and a bone hand[le].  It also had what appeared to be blood on it."  P.D. 123 Report of Investigation, 2004 Hearing Exh. 22.  The police discovered the sheath for this knife on Fessenden Street.  *See* P.D. 698 Supplementary Evidence Report, 2004 Hearing Exh. 23.[20]

The prosecution produced forensic evidence as well.  An expert from the Federal Bureau of Investigation concluded that some of Mr. Jones's clothing was heavily stained with Type "O" blood and that both Mr. Battle and Mr. Jones had that blood type.  The expert could not determine if the blood came from Mr. Jones or Mr. Battle.  Although a few items of clothing obtained from Messrs. Sousa and Diamen had blood stains, the marks were too small to type test.  *Id*. at 587.  Mr. Eastridge's clothing was entirely free of blood.  Of the knives initially recovered and

---

[19]  Officer Patrick McGinnis later testified that there was dust "uniformly circulated on the hunting knife."  Trial Tr. at 1267 (McGinnis).

[20]  In addition, Judy Norris testified to finding a switchblade knife outside a savings and loan on Wisconsin Avenue the day after Mr. Battle was killed.  Trial Tr. at 1434-36 (Norris).

tested, only the Bowie knife was stained with blood.  *See* Trial Tr. at 626 (Simms).  Dr. William

Brownlee opined that Mr. Battle's wounds were probably caused by two knives of different sizes

and, further, that some of the numerous knives entered into evidence were of a size and shape that

could have inflicted the wounds that Mr. Battle suffered.  Trial Tr. at 1911-18 (Brownlee).

Dorothy Willetts's testimony at trial was the capstone to the prosecution's case

against Messrs. Eastridge and Sousa.  Ms. Willets was a volunteer witness who had contacted the

prosecutors before trial and informed them that Mr. Eastridge and Mr. Sousa had repeatedly

confessed to the murder.[21]

Ms. Willetts testified that she and her husband went to a restaurant called "The Jockey

Club" near Richmond, Virginia, about two weeks after she gave birth to a child. The Willettses

shared a table with Patricia Moser and Rita Kerr. Trial Tr. at 1658-61 (Willetts).[22]  Messrs. Eastridge

and Sousa, who had been released from jail pending trial, came over and sat down and Mr. Sousa

confessed that "while you were having the kid, we were killing a nigger in D.C. . . . ."  *Id*. at 1662.

When Ms. Willetts inquired further, Mr. Sousa allegedly responded, "'Not me; he did it.'  And he

looked at Wayne [Eastridge]."  *Id*.  According to Ms. Willetts, they each implicated the other,

---

[21]  The Government called one of the trial prosecutors, Joseph Guerrieri, at the 2004
Hearing.  He testified that Ms. Willetts "called the United States Attorneys office indicating that
she had some information concerning a case we were investigating.  And in some way, we then
contacted her."  2004 Hearing 12/9/04 Tr. at 62 (Guerrieri).

[22]  Ms. Willetts adopted a prior statement that was read to the grand jury in which she
alleged that Tommy Newton was present at the Jockey Club with Pat Moser on at least one of
times that Messrs. Sousa and Eastridge implicated themselves.  She stated that Petitioners
threatened Mr. Newton and discussed the "incident in D.C." 2004 Hearing, Exh. 8 at 11.  Mr.
Newton signed an affidavit in 1991, swearing that, although he attended the Jockey Club in 1974
or 1975 with Ms. Moser, Petitioners never threatened him or mentioned the murder.  2004
Hearing, Exh. 36.

claiming that Mr. Eastridge cut off Mr. Battle's ear and Mr. Sousa cut off his nose. *Id*. Mr. Eastridge then purportedly exclaimed, "'Well, I just can't help it when I get to stabbing. I can't help it. I can't quit. I kept going.'" *Id*.

Ms. Willetts testified that Mr. Sousa again made incriminating remarks in March or April 1975, at a nightclub called "Horns." Ms. Willetts was out with her husband and Ms. Moser, and observed Mr. Sousa threatening a waitress that, unless the waitress gave him the correct change, "he would cut her like he did that nigger in D.C." *Id*. at 1668.[23]

Ms. Willetts further testified that Mr. Sousa again incriminated himself at the "Scottish Inn" on November 9, 1975. While with her husband and Sandra and Michael Kurz,[24] Ms. Willetts testified that she overheard Mr. Sousa in the middle of a conversation with Bran Dillard.[25] "I said to Nick [Sousa] that I hadn't lied on him before in court, and that I wanted him to know that I didn't intend to lie if I was called as a witness up here." *Id*. at 1673. Mr. Sousa reportedly responded "Yeah, I know; that's what worries me . . . . With what you could say, I might get forty years." *Id*.

Without additional detail of times and places, Ms. Willetts also testified that Messrs. Eastridge and Sousa repeatedly discussed the killing in her presence: they acknowledged cutting off

---

[23] Although not clear from the trial record, the Grand Jury testimony indicates that the waitress was Lillian Gordon, Mr. Willetts's former sister-in-law. *See* 2004 Hearing, Exh. 8 at 8.

[24] Petitioners propose that the trial transcripts incorrectly list these names as Sandra and Michael "Kerr." Ms. Willetts stated at trial that Sandra was her husband's foster sister. Trial Tr. at 1672. At the 2004 Hearing, Michael Kurz stated that his former wife Sandra was Charles Willetts's foster sister. 2004 Hearing 12/8/04 P.M. Tr. at 32 (Kurz).

[25] Again, Petitioners propose that the trial transcript is incorrect, referring to "Fran" instead of Bran Dillard. Petitioner's Post-Evidentiary Hearing Brief at 10.

the victim's nose and ears on "seven or eight - ten" occasions. *Id.* at 1675. "Nick and Wayne would

talk about it back and forth to each other just practically every time we were with them . . . ." *Id.*

Indeed, Ms. Willetts testified that the last time she heard discussion of the mayhem was on June 7,

1975. *Id.* at 1677.

At the close of the Government's case, the defendants moved for judgment of

acquittal, arguing, among other points, that no direct forensic or witness testimony tied them to the

murders.  In response, the prosecutor argued, "[T]he question before this jury, is whether these

defendants are guilty; not whether these defendants are the only persons who are guilty, but whether

these defendants are guilty." *Id.* at 2087.  The trial judge denied all the motions and the defendants

called witnesses on their behalf.

The defendants attempted to discredit Ms. Willetts, the only witness to put knives in

the hands of Messrs. Eastridge and Sousa.  Each defendant also testified on his own behalf.

Donald Lambert, a friend of Mr. Sousa, testified that he was at the Scottish Inn in

November 1974 on one of the nights that Ms. Willetts claimed inculpatory statements were made.

Ms. Willetts approached their table and bumped into Mr. Sousa.  Although they exchanged words,

Mr. Lambert claimed the encounter was unremarkable; he could not remember specifically what they

said to each other but he did not hear any discussion of assaulting or killing a Black man.  Trial Tr.

at 2147 (Lambert).  Lillian Gordon testified that she worked as a waitress at Horn's Motor Lodge

in 1974.  Contrary to Ms. Willetts's claim, Ms. Gordon asserted that Mr. Sousa had never threatened

her or said that he would "cut her" like he had a Black man in Washington.  Trial Tr. at 2162

(Gordan).  On cross-examination, she denied that she had a dispute with Mr. Sousa over the amount

of change he should receive on a bill.  *Id.* at 2166.  Ms. Kerr testified that she had been at the Jockey

-22-

Club with Mr. Eastridge on a night that Ms. Willetts was also present.  Ms. Kerr stated that she never

heard Mr. Eastridge make any remarks that associated him with the killing of Mr. Battle.  Trial Tr.

at 2278 (Kerr).

Mr. Sousa testified on his own behalf and recounted the events of November 1, 1974.

After the group exited the Godfather, Mr. Sousa walked back to the car.  He heard gunfire as he

reached the car door on the driver's side.  *Id*. at 2196.  "I put my head down right beside the car."

*Id*. at 2198.

> As I got back up, I walked around to the front of the car and I seen
> somebody – I didn't know at that time who it was – laying on the
> sidewalk.  I walked up and I seen it was D.J.  And at that time
> Cheyenne [Mr. Richter] yelled: "Everybody get in the car and let's get
> out of here."
> . . . .
>
> . . . I walked back around and got into the car I was driving, and he
> took off and went to the corner right there at Fessenden and
> Wisconsin Avenue, and then he made a right, and I pulled – eased off
> from there.  And before I got to the corner of – before I got to the
> intersection right there at Wisconsin, Abe [Mr. Diamen] got in the
> car.
>
> Then I went to the stop sign and stopped, and just about as I was to
> make a right onto Wisconsin, Wayne [Eastridge] got in the car.
>
> And I looked down the street.  I knew in Cheyenne's [Mr. Richter's]
> car there wasn't but like three or four people, and I knew it was a lot
> more . . . of us there.  I mean, it was probably seven or eight people
> that weren't accounted for.
>
> So I looked down Wisconsin Avenue and I didn't see anybody on the
> street really.  And I took a left at the first left.  I went up the street,
> and then when I got to the end of that street, I took another left and I
> was coming back down – I reckon its Fessenden Street there – and
> Steve [Jones] got in the car.

*Id*. at 2196-97.  Mr. Diamen got in the front seat of the car, Mr. Eastridge in the back passenger-side

seat, and Mr. Jones in the back driver-side seat.  Mr. Sousa denied stabbing Mr. Battle.  *Id*. at 2208.

Mr. Eastridge gave a similar account of the evening.  After leaving the Godfather, he

went to his car, "opened the door and I started to sit down . . . ."  Trial Tr. at 2303 (Eastridge).  He

heard the exchange of words and saw Mr. Battle shoot Mr. Hunter.  Mr. Battle then "shot at me and

it ricocheted by the sidewalk.  So I jumped over Mr. Hunter, like over to the side."  *Id*. at 2303.  Mr.

Eastridge then "ran like to the alley, and then I come back.  Then I looked and I seen it was – like

I seen the black dude cutting the corner, and it was like – it was five guys; the[y] were like staggered,

two and two, and it looked like one was in the middle or a little behind, and they, you know went

around the corner."  *Id*. at 2304.  Mr. Eastridge ran to the corner of Wisconsin and Fessenden.

> I looked down the street [Wisconsin Avenue] and I could see – I don't
> know.  It looked like four people on one side of the street.  I could see
> the black guy.  He was out in front.  Then I seen two other guys
> coming like down the side from the Godfather.  It was a bunch of
> people out in front of that and they were coming down through there,
> and then they cut off and they ran out of sight and I didn't see them.

*Id*. at 2305.  On cross-examination, Mr. Eastridge testified extensively about the chase, but claimed

that he could not identify any of the chasers.  *Id*. at 2364-65.  He only saw "a couple of white shirts."

*Id*. at 2381.  Mr. Sousa picked Mr. Eastridge up at the corner and their testimony was consistent as

to events thereafter and with the Court's findings above.

Mr. Diamen testified that he had been walking with Mr. Hunter at the time he was

shot.  Trial Tr. at 2489-91 (Diamen).  He said that he ran, after the shots, "away from Wisconsin and

away from the man with the gun."  *Id*. at 2492.  Accordingly, he did not witness the chase.  When

he returned to the area where the shots had been fired, Mr. Diamen heard a horn beep.  *Id*.  He then

got in the car with Mr. Sousa and they picked up Mr. Eastridge a few seconds later at the corner of

Wisconsin Avenue. The car then proceeded south on Wisconsin and turned east onto Emery Place.

Like Messrs. Eastridge and Sousa, Mr. Diamen testified that they picked up Mr. Jones somewhere

near Fessenden. *Id*. at 2495. The car returned to the corner of Fessenden and Wisconsin, after which

the police stopped them.

  Mr. Jones recounted the altercation with Messrs. Battle, Brown, and Allen. On direct

examination, he asserted that Mr. Battle shot at him. Mr. Jones then gave chase, "running right

behind him, and [Mr. Battle] still had the gun in his hand." Trial Tr. at 2428 (Jones). Although he

did not see anyone, he heard "a whole group of footsteps" behind him, also chasing Mr. Battle. *Id*.

at 2429. As they ran down Wisconsin Avenue, Mr. Battle turned to shoot again. When Mr. Battle

turned to shoot, Mr. Jones dove behind a tree and then walked back toward Fessenden Street where

he joined Messrs. Eastridge, Sousa, and Diamen in the green Plymouth. *Id*. at 2429-30. Mr. Jones

claimed that he did not know what happened to Chesley Barber, Charles Jennings, or John Wood

after Mr. Battle fired and Mr. Jones gave chase. *Id*. at 2483.[26]

  During closing argument, the prosecution proposed that the defendants could be

found guilty as aiders and abettors if not as principals in the death of Johnnie Battle. "This is a legal

principle, ladies and gentlemen. His Honor will instruct you that you may find the defendant or

defendants guilty of the crime charged, without finding that he or they personally committed each

of the acts constituting the offense, or even that they were personally present at the commission of

the offense." Trial Tr. at 2785 (Government Closing Argument). The defendants objected to the

---

[26] Mr. Jones attempted to explain the blood on his clothing by testifying that he had cut
his hand in the fight at JJ's and, after chasing Johnnie Battle, he noticed once again that his hand
was bleeding. Trial Tr. at 2419, 2430 (Jones).

introduction of this aiding and abetting charge for the first time in closing argument, arguing that there was no evidence to support the charge. *Id*. at 2841. The trial court overruled the objections, *id*. at 2821-22, and instructed the jury that they could find the defendants guilty of first-degree murder while armed, first-degree murder, second-degree murder while armed, second-degree murder, manslaughter while armed, or manslaughter, *id*. at 2847. In addition, the court gave an aiding and abetting instruction.

The jury returned a verdict of guilty of First-Degree Murder While Armed against each of the Petitioners. All defendants, except Mr. Jones, appealed their convictions.

## IV.    NON-FEDERAL POST-TRIAL APPEALS AND PETITIONS

The District of Columbia Court of Appeals affirmed Petitioners' convictions. *See Sousa v. United States*, 400 A.2d 1036, 1038 (D.C . 1979).[27]

Mr. Eastridge filed a motion for a new trial in the District of Columbia Superior Court in 1981, alleging that he was denied effective assistance of counsel and that new evidence (namely, unsworn statements by Mr. Jones) exonerated him. The court denied this motion without an evidentiary hearing. *See United States v. Eastridge*, 110 Wash. L. Rep. 1181, 1187 (D.C. Super. Ct. 1982). The Court of Appeals affirmed, finding that counsel's performance was not grossly incompetent. Although noting that counsel's ability to cross-examine Ms. Willetts was severely limited by the trial court's limitations on cross-examination, the Court of Appeals found that this did not render counsel legally ineffective. *See United States v. Eastridge*, No. 82-387, slip op. at 3-6 (D.C. June 16, 1983).

---

[27] The Court of Appeals overturned Mr. Richter's convictions on direct appeal, finding that the trial court had erred in not severing the charges against Mr. Richter from the murder charges, and also finding that the evidence was inadequate.

In September 1983, Mr. Diamen filed a *pro se* Motion to Vacate Judgment and Sentence in the Superior Court, asserting improper race-based use of peremptory challenges, double jeopardy, ineffective assistance of counsel, newly-discovered evidence,[28] and his incompetence to stand trial. The trial court denied this motion without an evidentiary hearing, finding that the alleged new evidence was either inadmissable hearsay or unreliable and was not likely to result in an acquittal.

In April 1995, Petitioners filed a joint Motion to Vacate Convictions and Request for Evidentiary Hearing in Superior Court pursuant to D.C. CODE. ANN. § 23-110, requesting that the court vacate their convictions based on new evidence and a claim of actual innocence. Judge John H. Suda held that the new evidence claims were barred by the two-year statute of limitations found in SUPER. CT. CRIM. R. 33.[29] *United States v. Eastridge*, Nos. F-53482-75, F-53843-75, F-53485-75, slip op. at 2 (D.C. Super. Ct. Feb. 14, 1996). *See also id.* at 9 ("Defendants may not subvert Rule 33's provision and statutory time limitations based on newly discovered evidence by alleging that the claims fall under § 23-110."). In the alternative, the court found that the new evidence did not outweigh the testimony presented at trial as it consisted primarily of affidavits from witnesses who could have testified at trial, along with an affidavit from Mr. Jones recanting his trial testimony. *Id*. The court found that this evidence did not meet the "actual innocence" standard set forth in *Herrera*

---

[28] The newly-discovered evidence consisted of an affidavit from Raymond Lurtz that Mr. Wood confessed to the crime and stated that Mr. Diamen had no involvement, as well as an unsworn statement from Mr. Jones recanting his trial testimony.

[29] The Court also noted that Messrs. Eastridge and Diamen had already filed Section 23-110 motions and were procedurally barred from filing successive motions. However, because it also had to analyze Mr. Sousa's Section 23-110 claim, it applied that analysis to the claims raised by Messrs. Eastridge and Diamen. *United States v. Eastridge*, Nos. F-53482-75, F-53843-75, F-53485-75, slip op. at 12 (D.C. Super. Ct. Feb. 14, 1996).

*v. Collins*, 506 U.S. 390 (1993) and therefore did not warrant vacation of Petitioners' sentences. *Id.* at 9, 11.

In a divided decision, the District of Columbia Court of Appeals affirmed, finding that the new-evidence claims were time-barred by the two-year time limitation found in SUPER. CT. CRIM. R. 33. *Diamen v. United States*, 725 A.2d 501, 507-08 (D.C. 1999). The appeals court also rejected Petitioners' contention that the Rule, upheld on direct appeal,[30] was unconstitutional because, "as a successor division" to the panel that dismissed the appeal, it could not "second-guess" that decision simply because it "disagrees with the earlier division's legal analysis and perceives a constitutional violation where the earlier division found none." *Diamen*, 725 A.2d at 510.

Although the court thus concluded that it lacked authority to consider the constitutionality of the Rule, it also stated that Petitioners had "failed to demonstrate that there was evidence available to them at the time of trial which could have had a significant impact on the outcome if the rule had been relaxed." *Id.* at 510 n.25. Finally, the court held that because the new-evidence claim was time-barred and because the constitutional claim was not viable, Judge Suda properly refused to convene an evidentiary hearing. *Id.* at 513.[31]

In dissent, Judge Ruiz stated that the time limitation of Rule 33 did not apply to motions filed under Section 23-110 and that the majority's decision rendered Section 23-110

---

[30]  To date, no court has specifically addressed the constitutionality of the trial court's Rule. It was summarily rejected without discussion in the direct appeal. *Sousa v. United States*, 400 A.2d 1036, 1038 n.1 (D.C. 1979) ("We have examined the multitude of other contentions made by appellants and find them to be without merit.").

[31]  The Court of Appeals suggested, but did not decide, that "[b]ut for the time limitation contained in Rule 33, a hearing on the appellants' § 23-110 motion might well be appropriate in this case." *Id.* at 514, 514 n.38.

"inadequate and ineffective" when compared with federal habeas relief. *Id*. at 516 (J. Ruiz dissenting). Judge Ruiz "ventur[ed] that the majority's narrow interpretation of our habeas statute, if allowed to prevail, could subject us to unprecedented federal court habeas review under § 23-110(g)." *Id*. at 517.

## V.    FEDERAL HABEAS PETITION

On December 21, 2000, twenty-five years after the murder of Johnnie Battle, Messrs. Eastridge, Diamen, and Sousa petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.[32] Under Section 2241, a prisoner who is being detained in violation of the United States Constitution may apply for a writ of habeas corpus in federal court. The Petition proposed that "constitutional violations have resulted in the conviction of several men who are actually innocent." Petition for Habeas Corpus at 12.

The Government opposed the Petition, arguing that Petitioners were attempting to relitigate unsuccessful claims made in earlier post-trial motions and appeals in the local courts of the District of Columbia. Furthermore, the Government asserted that the grounds for the habeas petition were legally infirm because Petitioners had failed to demonstrate that the remedy available for such review under the law of the District of Columbia was ineffective or inadequate.

These arguments presented this Court with a difficult question regarding the intersection of District of Columbia and Federal habeas law. The District of Columbia Court Reform and Criminal Procedure Act, Pub. L. No. 91-358 (1970) ("DCCRCPA") transferred jurisdiction over

---

[32]  When the Petition was filed, Messrs. Diamen and Sousa were on parole after serving nineteen years in prison. Mr. Diamen has now died. Mr. Eastridge has since been released on restrictive parole after twenty-nine years in prison. Mr. Jones, who was a juvenile at the time of Mr. Battle's murder, served less than four years in prison and did not participate in subsequent appeals nor petition this Court to vacate his conviction.

purely local matters from the federal courts to the Superior Court of the District of Columbia, with appeals to the District of Columbia Court of Appeals. The DCCRCPA contains a provision allowing prisoners who were sentenced in the Superior Court to challenge their convictions or sentences.[33] Enactment of the DCCRCPA "entirely divested the federal courts of jurisdiction to hear habeas corpus petitions by prisoners who had a section 23-110 remedy available to them, unless the petitioner could show that the section 23-110 remedy was 'inadequate or ineffective,' an exception that we will call the 'safety valve.'" *Blair-Bey v. Quick*, 151 F.3d 1036, 1042 (D.C. Cir. 1998) (citations omitted).[34]

After briefing and oral argument, this Court found that the District of Columbia Court of Appeals in *Diamen* had misapplied *Schlup*, failing to appreciate the significance of Petitioners' claims of both actual innocence and a constitutional violation of their rights at trial. *See Eastridge v. United States*, 00-3045 (RMC), Hearing Tr. at 41-51 (D.D.C. May 24, 2004). Deciding that the Court of Appeals had grafted additional requirements, including the local statute of limitations, onto

---

[33]

> An application for a writ of habeas corpus on behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section shall not be entertained by the Superior Court or by any Federal or State court if it appears that the applicant has failed to make a motion for relief under this section or that the Superior Court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

D.C. CODE ANN. § 23-110(g).

[34] *Swain v. Pressley*, 430 U.S. 372, 381 (1997), found this limited access to federal court fully constitutional because the safety valve, identical to the safety valve at 28 U.S.C. § 2255, "avoids any serious question about the constitutionality of the statute." *See also id.* ("[T]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus.").

Petitioners' Section 23-110 claim, the Court concluded that the remedy available in the local courts of the District of Columbia was inadequate or ineffective.[35]   Accordingly, it ordered an evidentiary hearing to determine whether, in light of new evidence, the Petitioners were entitled to a substantive review of their constitutional claims.  *See id.*

## VI.    EVIDENTIARY HEARING ON PETITION FOR HABEAS CORPUS

In December 2004, the Court conducted a three-day evidentiary hearing at which the Petitioners sought to disprove the Government's theory of the case at trial – that Petitioners had chased Mr. Battle on foot with "knives drawn."  Further, to the extent the Government's theory changed either at trial or after the fact, Petitioners sought to demonstrate that, given all the evidence available now, no reasonable juror could find them guilty of the murder of Mr. Battle.  Through testimony from new witnesses and new evidence from witnesses who appeared at trial but could not be questioned under the Rule, Petitioners attempted to show that: 1) the blood evidence was not inculpatory; 2) that it would have been temporally impossible for the Petitioners to have chased Mr. Battle on foot to the Roundtable, returned to Fessenden Street without being seen, and then have driven south in full view on Wisconsin Avenue in the green Plymouth; 3) the knives used to kill Mr. Battle belonged to Mr. Jennings and Mr. Barber; 4) Messrs. Jennings, Barber, and Wood inculpated themselves through statements and actions after the murder; 5) Dorothy Willetts was not credible and her testimony explicitly refuted; and 6) Mr. Jones now confesses that he, along with Messrs. Jennings, Barber, and Wood, killed Mr. Battle.

---

[35]  The Court also found that the habeas petition would be appropriate under 28 U.S.C. § 2254.

In often emotional tones, Mr. Eastridge testified at the 2004 Hearing about the events of November 1, 1974, his incarceration, and attempts to regain his freedom.[36]  His testimony was consistent with, but expanded upon, his trial testimony.

After the Pagans left the Godfather, Mr. Eastridge walked around the corner onto Fessenden Street to the back door of the green Plymouth, where he sat down on the back seat with his legs on the sidewalk.  *Id.* at 17.  He saw Mr. Battle fire the first shot and "jumped up and a shot hit the sidewalk and sparks flew.  I thought I was being, you know, shot at.  I ran to the corner here [indicating an alley off Fessenden on an exhibit] and I heard another shot . . . ."  *Id.* at 18.  Clutching a bottle of Jim Beam whiskey, Mr. Eastridge ran to the corner of Wisconsin and Fessenden and continued running ten or fifteen feet down Wisconsin Avenue.  *Id.  See id.* at 38.  From that position he observed three people chasing Mr. Battle across the street and onto Emery Place.  *Id.* at 19.

Mr. Eastridge then saw Mr. Richter's car rounding the corner from Fessenden onto Wisconsin, going south toward Virginia.  *Id.*  Mr. Eastridge headed back up Wisconsin Avenue and saw Mr. Sousa in the green Plymouth at the corner of Fessenden and Wisconsin.  Mr. Sousa slowed down and Mr. Eastridge climbed into the back seat.  *Id.* at 20.  The car drove south on Wisconsin and took the first left onto Emery Place.  *Id.* at 21.  After making another left on 41st Street, the car

---

[36]  In 1986, Mr. Eastridge took a polygraph examination in which he recounted a different version of the events of November 1, 1974.  In the polygraph exam, he stated that he had watched the murder of Mr. Battle from a distance of fifty yards.  He passed the exam.  2004 Hearing 12/9/04 Tr. at 44-45 (Eastridge).  Yet at the trial and the 2004 Hearing, he stated that he only went a short distance down Wisconsin Avenue before turning around and getting in the car.  At the 2004 Hearing, Mr. Eastridge explained that he and Mr. Jones were temporarily jailed together in Baltimore, MD, after the trial and that Mr. Jones confessed his role and described the murder.  Knowing he was innocent, this description stayed alive in Mr. Eastridge's mind so that he could give a false accounting years later and believe it must have been true.

drove north to Fessenden Street, where they picked up Mr. Jones. *Id*. at 22. When Mr. Jones got

into the car, Mr. Eastridge handed him some newspaper to wipe blood off his hands. *Id*.

Mr. Sousa also testified at the 2004 Hearing in a manner consistent with his trial

testimony. Mr Sousa drove Mr. Eastridge's car with Messrs. Eastridge, Diamen, Wood, Jennings,

and Barber to the Godfather. 2004 Hearing 12/8/04 Tr. at 25 (Sousa). After exiting the Godfather,

Mr. Sousa walked north on Wisconsin Avenue and east on Fessenden to the Eastridge car at the

driver's side, on the street. *Id.* at 29. He ducked down behind the car when Mr. Battle fired his first

shot. *Id.* at 30. Mr. Sousa was left alone once the Richter car left with the wounded Mr. Hunter.

He climbed into the green Plymouth and began to pull away. *Id*. at 33. As he did so, he noticed Mr.

Diamen on Fessenden Street and picked him up. *Id*. at 33. Mr. Sousa saw Mr. Eastridge just as he

was rounding the corner from Fessenden onto Wisconsin, going south, so he picked him up too.

They drove south on Wisconsin Avenue and turned at the first left, onto Emery Place where Mr.

Eastridge had seen the chase head, turned left at the first street (41st Street N.W.) going north, and

left again onto Fessenden. *Id*. at 34. On Fessenden, Mr. Sousa stopped to pick up Mr. Jones. *Id*.

at 35.

Mr. Sousa also testified to a prior sexually-intimate relationship with Ms. Willetts,

which he had ended and which had caused Ms. Willetts to become vengeful and angry, as

demonstrated by Ms. Willetts's call to Mrs. Sousa to report the affair *after* it was over. *Id.* at 41.

Ms. Heim testified at the 2004 Hearing, revealing for the first time that she had never

met Messrs. Sousa and Eastridge before the night Mr. Battle was killed, but that Mr. Jones was her

boyfriend and she knew the others as friends of Mr. Jones. 2004 Hearing 12/7/04 Tr. at 44 (Heim).

Unlike at trial, where she testified generally that people "scattered" after the shooting, Ms. Heim testified at the 2004 Hearing that she saw Mr. Jones running toward Wisconsin Avenue, pursuing Mr. Battle, who had already begun his flight across Wisconsin Avenue. *Id*. at 55. Because she was panicked, she did not notice either of the Petitioners. *Id*.[37] Within minutes of the shooting, Messrs. Richter, Hunter, and Greenwood, along with Ms. Summers and Ms. Heim, departed for a Virginia hospital. *Id*. at 57. The green Plymouth was still parked on Fessenden when they drove off. *Id*. at 56.

Petitioners' counsel also questioned Ms. Heim about the Grand Jury testimony of Mr. Jennings and Mr. Wood. Neither man testified at the trial. However, Mr. Jennings told the Grand Jury that, after the incident at JJ's, both he and Mr. Wood decided not to go to the Godfather. *Id*. at 48-49. Mr. Wood's Grand Jury testimony was substantially similar, adding that Mr. Jennings had driven him home and that he was in "no way involved in any of the events that took place at or near the Godfather Lounge . . . ." *Id*. at 50 (quoting Wood's Grand Jury testimony). Ms. Heim reaffirmed her trial testimony that both Mr. Jennings and Mr. Wood were at the Godfather on November 1, 1974 and that they were present during the encounters with Messrs. Battle, Brown, and Allen. *Id*. at 53.

This Grand Jury testimony was not provided to the defense for use at trial. While defense counsel repeatedly emphasized that Mr. Jennings and Mr. Wood, among others, were in the group at the Godfather – as a way to suggest that others might have been the murderers – no one

---

[37] On cross-examination, Ms. Heim conceded that, because she did not know their location, Petitioners could have run after Mr. Battle. *Id.* at 65. The Government then suggested that Mr. Eastridge ran around the corner from Fessenden to Wisconsin but then returned and got into the car driven by Mr. Sousa. *Id*. at 66.

sought to introduce the testimony that would suggest they might have had guilty minds and lied to the Grand Jury. *See*, *e.g.*, Trial Tr. at 2058. There is no doubt that the prosecution was aware before trial that the Jennings/Wood claim of distance from the Godfather was contradicted. *See* 2004 Hearing, Govt. Exh. 20 (Statement of Chesley Barber) at 2 (stating that while running back to Virginia from the Godfather, he ran into Mr. Jennings who was also fleeing). Such information would have been probative of defendants' innocence, demonstrating that someone had lied about being present.[38]

Further disputing the Grand Jury testimony, Ms. Heim stated on direct examination at the 2004 Hearing that she and others gathered at Mr. Richter's house after dropping Mr. Hunter at a hospital emergency room. Messrs. Barber and Jennings arrived looking "distraught" and stated that they "got to lay low" and "that they had run all the way from D.C." 2004 Hearing 12/7/04 Tr. at 59 (Heim). This testimony was disallowed by the trial court's Rule because it would have tended to implicate Mr. Richter. Trial Tr. at 1807-08.

Michael Grayson, a former Pagan who had no involvement in the events of November 1, 1974, testified briefly at the 2004 Hearing about a conversation he had with Mr. Wood in 1979 regarding the killing of Mr. Battle. During this conversation, Mr. Wood allegedly acknowledged that he and Mr. Jennings had indeed been present at the Godfather and were involved in the murder.

> And at that point, he told me that himself [Mr. Wood], Slick [Mr. Jennings], Slack [Mr. Jones] and Chesley Barber, the four of those were involved in the actual murder. He didn't tell me, I don't know

---

[38] The trial prosecutor could not remember whether he released the Grand Jury testimony of Jennings and Wood in which they claimed that they did not go to the Godfather. 2004 Hearing 12/9/04 Tr. at 80-85 (Guerrieri). Given its obvious value to bolster the argument that others murdered Johnnie Battle, and the complete silence in the record concerning the Grand Jury testimony, the Court concludes that it was not produced.

what part anyone played in it.  But he did tell me that Slack, Mr.
Jones had tackled, I can't remember the gentleman's name.  I'm
sorry.
. . . .
And I know that Wrench [Mr. Wood] felt pretty bad that these guys
were doing time and he wasn't because, you know, as Pagans, you
know, it's just like we were taught when we were kids.  You don't
tell a tale, but you also take your own weight.  And these brothers
here, did between 20 and 30 years of their lives for something they
didn't do.

2004 Hearing 12/8/04 Tr. at 89 (Grayson).[39]

This testimony was confirmed by Mr. Jones, who appeared with his own counsel to

testify at the 2004 Hearing to admit to his participation in Mr. Battle's murder.  Mr. Jones was an

obviously reluctant witness; he has re-directed his life and did not want to revisit the Johnnie Battle

murder.  For years, he had offered unsworn declarations of Petitioners' innocence but had refused

to identify the guilty as long as they were alive. This time, he testified clearly under oath about his

role and the roles of others, and the Court found him to be a credible witness.  Mr. Jones testified

that twelve persons went to the Godfather on November 1, 1974, including Messrs. Eastridge, Sousa,

Barber, Wood, Jennings, and Diamen.  Unlike his testimony at trial, Mr. Jones recounted with

specificity the events that led up to Mr. Battle's death.  "The man that was shooting . . . shot the guy

next to me, and shot a couple more times.  Shot at the guy to the right of me.  We were, our backs

were to the cars.  So there was no where to go.  And he was back peddling. So we went at him

because there was nothing else to do." 2004 Hearing 12/8/04 Tr. at 61 (Jones). Mr. Jones and others

---

[39] Petitioners read into the record portions of a sworn affidavit by Mr. Richter in which
he stated that Mr. Wood had admitted his role in Mr. Battle's murder and had implied that the
Petitioners had not been involved.  Mr. Richter's affidavit also stated that Mr. Jennings had
inculpated himself and that Mr. Jennings's girlfriend had commented, soon after the murder, that
"I now know what I need to get Slick for Christmas, a new buck knife."  2004 Hearing 12/9/04
Tr. at 58-59.

gave chase down Wisconsin Avenue and across the small strip of grass at the intersection of 42nd Street and Wisconsin. *Id*. at 62.

Mr. Jones dropped his claim that Mr. Battle shot again and that Mr. Jones dove behind a tree. *See* Trial Tr. at 2429. To the contrary, he testified in a detailed fashion that he ran after Mr. Battle and chased him south across Wisconsin Avenue to the three-way intersection of Wisconsin, 42nd and Emery, east on Emery Place to an alley half-way down the block, and south down the alley, emerging on Ellicott Street at the parking lot of the Roundtable Restaurant. 2004 Hearing 12/8/04 Tr. at 62 (Jones). At that point, the younger Mr. Jones caught Mr. Battle from behind and knocked him down. *Id*. Mr. Jones openly identified Messrs. Jennings, Barber, and Wood as the additional men who chased Mr. Battle down Wisconsin Avenue. *Id*. Once Mr. Jones had knocked Mr. Battle down, the others caught up and jumped on top of him. According to Mr. Jones, he punched and kicked Mr. Battle, while Messrs Jennings and Barber repeatedly stabbed him, *id*. at 63, Mr. Barber with a Puma Bowie hunting knife and Mr. Jennings with a buck knife, *id*. at 65-66.[40] Mr. Jones did not know if Mr. Wood stabbed Mr. Battle. After the stabbing, Mr. Jones

---

[40]    Kathy Hafferman, who did not testify at trial, corroborated some of Mr. Jones's testimony. She dated Mr. Diamen in 1974 and was friendly with Mr. Barber and his wife, Tina. Ms. Hafferman described Mr. Barber as "clean-cut," with a goatee and shorter hair than the other Pagans. 2004 Hearing 12/7/04 Tr. at 72 (Hafferman). Unlike the other Pagans, Mr. Barber typically wore jeans and a white T-shirt. *Id*. at 73.

Petitioners' counsel noted that Ms. Hafferman's description was consistent with the description of one of the chasers given by Mr. Motlagh at trial. Mr. Motlagh described the chaser with the knife in his hand as having "dark hair with a mustache and goatee and a tattoo on his arm. He had a white T-shirt on and a black leather vest and blue jeans." *Id.* at 83 (citing to Trial Tr. at 494-Z - 495). Furthermore, Petitioners' counsel pointed out that police property records, which listed the items removed from the Petitioners on the night of their arrest, do not mention a white T–shirt. *Id*. at 84 (referring to 2004 Hearing Exh. 20 which described clothing recovered from Petitioners but did not mention items such as socks and undergarments).

testified that he and Mr. Barber ran back up the alley but parted company. *Id.* at 63, 78. Mr. Jones then saw the green Plymouth with Sousa, Eastridge, and Diamen. Mr. Jones climbed in and Mr. Eastridge handed him a piece of newspaper to wipe blood off his hands. *Id.* at 79.

Lillian Gordan-McClure, formerly Lillian Gordan, testified at the 2004 Hearing. Through her demeanor and the clarity of her answers, Ms. Gordan-McClure appeared to be a fully-credible witness. As she did at trial, Ms. Gordan-McClure testified that she worked at Horns in 1975. Hearing a reading of Ms. Willetts's trial testimony that Mr. Sousa had threatened to "cut" Ms. Gordan-McClure "like he did that nigger in D.C." during a confrontation over the bill, Ms. Gordan-McClure emphatically denied it. 2004 Hearing 12/8/04 P.M. Tr. at 41 (Gordan-McClure). Indeed, because Ms. Gordan-McClure had once been related to Ms. Willetts's husband by marriage, she knew that Ms. Willetts was at Horns with her husband but recalled no such incident. *Id.* at 43.

As to Ms. Willetts's trial testimony that Michael Kurz and his wife Sandra were with her at the Scottish Inn when Mr. Sousa allegedly stated that her testimony could convict him, Trial Tr. at 1672-73 (Willetts), Mr. Kurz was called as a new witness at the 2004 Hearing and credibly testified that he had never been to the Scottish Inn, nor any bar, club or restaurant with Ms. Willetts.

---

(Footnote Continued)

Ms. Hafferman also testified at the 2004 Hearing that Mr. Barber possessed a large Bowie knife in 1974, a gift he had received for his birthday earlier that year. *Id.* at 73. This knife had a pearl handle and was different from the knives typically carried by Pagans, which were smaller and less noticeable. *Id.* at 74. Ms. Hafferman did not see the knife after November 1, 1974 and testified that Mr. Barber's wife told her that "the knife was missing and [Tina] was concerned that it would implicate Chesley [Barber] in the murder." *Id.* On cross-examination, Ms. Hafferman conceded that Mrs. Barber had not explicitly stated that Mr. Barber had confessed to killing Mr. Battle. *Id.* at 82.

2004 Hearing 12/8/04 P.M. Tr. at 32-34 (Kurz).  Mr. Kurz also testified that he never heard the Petitioners discuss the murder.  *Id*. at 33.

Lastly, Bran Dillard testified at the 2004 Hearing that he had worked at the Scottish Inn in 1974 as a musician and knew Messrs. Eastridge and Sousa, both of whom told him that they were innocent of Mr. Battle's killing.  2004 Hearing 12/7/04 Tr. at 90 (Dillard).  At trial, Ms. Willetts testified that Mr. Sousa made incriminating remarks at the Scottish Inn in November 1975 at which a "Fran Dillard" was present.  Trial Tr. at 1672-73.  The Petitioners believe that "Fran Dillard" is actually Bran Dillard.  2004 Hearing 12/7/04 Tr. at 95.  Contradicting Ms. Willetts's testimony, Mr. Dillard testified at the 2004 Hearing that Mr. Sousa never made an incriminating remark in his presence and that he does not recall being present during the incriminating dialogue to which Ms. Willetts testified.  *Id*. at 91, 95.  Additionally, Mr. Dillard testified that he knew Ms. Willetts and thought that "she was infatuated with [Mr. Sousa]," leading to false testimony at his trial *Id*. at 91.  Mr. Sousa was trying to repair his relationship with his wife and Mr. Dillard thought that Ms. Willetts was a "spiteful" woman.  "[Y]ou wouldn't want to cross that woman."  *Id*. at 92- 93.

Further testimony about Ms. Willetts's character was offered at the 2004 Hearing by Joyce Hughes, who believed that Ms. Willetts was a "vindictive person" who was "obsessed" with Mr. Sousa.  2004 Hearing 12/8/04 P.M. Tr. at 10 (Hughes).  Ms. Hughes alleged that Ms. Willetts had a pattern of such behavior, as when she became pregnant by Ronnie Garland, a man not her husband, and then threatened Mrs. Garland and tried to disrupt their marriage.  *Id.* It was Ms. Hughes's opinion that Ms. Willetts was "out for revenge" against Mr. Sousa.  *Id.* at 11.

John Gianaris testified at the 2004 Hearing that he was a witness to the actual stabbing of Mr. Battle.  Mr. Gianaris was not a witness at the original trial.  Coming thirty years

later, Mr. Gianaris's testimony was vague and incomplete at times. He testified that he "witnessed an incident. At the time [he] didn't know what had happened other than there was an altercation." 2004 Hearing 12/8/04 Tr. at 3 (Gianaris). Mr. Gianaris had first observed the chase. Mr. Battle was running down Wisconsin with either two or three persons giving chase. *Id*. at 10.

> I had come out of a restaurant across the street [Wisconsin Avenue] and I walked across the street. When I walked across the street I was aware of people running, people chasing somebody and I walked up the alley parallel to the street. When I came out [at Ellicott Street] I came out right in front of the murder . . . . I turned around and leaped over a fence in the adjacent yard which had big bushes and got down on the ground, tried to get out of the line of fire. From that point on I did not see a whole lot. I could see feet under the bushes, but I really couldn't see what was transpiring.

*Id*. at 3.[41] Mr. Gianaris testified that he was lying on the ground in a yard on Ellicott Street next to the alley that ran between Ellicott and Emery. *Id*. at 5. From his vantage point, he thought he saw three attackers, with other individuals hiding behind a tree. *Id*. The attackers appeared to be striking the man on the ground. *Id*. at 7. One of these attackers wore a jacket with motorcycle gang "colors" of some kind. *Id*. at 13. He did not see a car pull up. *Id*.[42]

---

[41] Mr. Gianaris testified to hearing gunshots. From the vantage point of thirty years later, it is impossible to assess the accuracy of this testimony.

[42] After the attack, as spectators began to gather, Mr. Gianaris saw two or three people get into a van at the corner of Ellicott and Wisconsin. 2004 Hearing 12/8/04 Tr. at 7 (Gianaris). Petitioners read into the record a statement of a police officer who was on the "lookout" for a green van on Wisconsin Avenue. This officer pulled over the van. A White male and female were inside, but they did not match the description of any of the suspects. *Id*. 12/9/04 Tr. at 60.

## VII.  ANALYSIS ON PETITION FOR HABEAS CORPUS

### A.  New Evidence of Innocence

Petitioners submitted a number of documents with their Petition that they assert establish their actual innocence, the "gateway" to review of their constitutional claims.  These include:

- Two affidavits from persons affiliated with Centurion Ministries.

- An affidavit from Mr. Jones recanting his trial testimony, admitting his role in the murder of Mr. Battle, and affirming that Messrs. Eastridge, Sousa, and Diamen did not participate in the murder.  The affidavit identifies Messrs. Jennings and Wood (both deceased), an unnamed individual, and Mr. Jones as the individuals who killed Mr. Battle.

- Affidavits from Mr. Grayson and Raymond Lurz, both former Pagans with criminal records, stating that in the 1970s Mr. Wood confessed to his role in the murder.  Mr. Wood implicated Messrs. Jennings and Jones to both affiants; professed Petitioners' innocence to both affiants; and indicated to Mr. Grayson that Mr. Barber was a fourth participant.

- An affidavit from Mr. Richter attesting that Mr. Wood confessed his role in the murder to him; that Mr. Jennings had told him he threw his buck knife into the sewer as he fled from the scene; and that Mr. Jennings desired to turn himself in shortly before he died in a traffic accident.

*See* Exhibits to Petition for Habeas Corpus.

At the 2004 Hearing, the Court received testimony from Mr. Grayson and Mr. Jones corroborating the information in their affidavits.  Significantly, Mr. Jones was now available and required to testify about the blood on his clothes and hands in response to questions that defense counsel were not allowed to ask under the trial Rule that had forbidden counsel for Messrs. Sousa and Eastridge from arguing to the jury that the large quantity of blood on Mr. Jones indicated that he was guilty while the lack of blood on them indicated that they were

innocent. Obviously, the Rule prevented any blame-shifting cross-examination of Mr. Jones at all.

In addition, testimony by Ms. Heim, which could not have been elicited at trial due to the Rule, confirmed that Mr. Jones was among the persons who chased Mr. Battle[43] and that Messrs. Jennings and Barber ran on foot from Wisconsin Avenue to Mr. Richter's house in Virginia, arriving distraught and needing to hide.[44]   Together with the Grand Jury testimony, not provided at trial to the defendants, Ms. Heim's testimony about these other Pagans could have decidedly changed the result at trial.  Had they had such information, defendants' counsel could have argued that the flight of Messrs. Jennings, Barber, and Wood on foot was evidence of their guilt.  *See United States v. Martinez*, 681 F.2d 1248, 1256 (1982) ("Traditionally, flight has been viewed as an admission by conduct which expresses consciousness of guilt.");  *Allen v. United States*, 164 U.S. 492, 499 (1896) (Flight is "competent evidence against [the accused] as having a tendency to establish his guilt.");  *United States v. Edmonds*, 240 F.3d 55, 62 (D.C. Cir. 2001)(similar).  The comparison between Messrs. Sousa, Eastridge, and Diamen – who stayed in the immediate area looking for the Pagans who had chased Mr. Battle – and Messrs. Jennings, Wood, and Barber, who left on foot and stayed out of sight, could have helped to demonstrate the innocence of the former by pointing out the guilty conduct of the latter.  Because of the Rule, Ms.

---

[43]  Ms. Heim testified to the Grand Jury that Mr. Jones chased Mr. Battle but at trial she said she did not see the chase.  Defense counsel were barred from cross-examining her on this point because of the Rule.  Trial Tr. 1807, 1811.

[44]  At the 2004 Hearing, the Court received previously-unavailable transcripts of the Grand Jury testimony of Messrs. Jennings and Wood in which they asserted that they were not at the Godfather on the night Mr. Battle was murdered, and a copy of Mr. Barber's statement that he was not involved in the murder.

Heim's testimony about seeing Mr. Jones and later events at Mr. Richter's house was not available. Because the prosecution failed to provide the Grand Jury testimony, clear *Brady* material, the fact of the Wood/Jennings lies under oath was not available.

Mr. Gianaris also provided new evidence – testimony that no car arrived in the area near the Roundtable bearing individuals who could have aided and abetted in the murder.[45] This testimony corroborated Mr. Sousa's consistent account that he turned left onto Emery Place and not Ellicott.

## B.    The Gateway: Actual Innocence of Eastridge and Sousa

Based on all of the evidence now available, the Court concludes that it is unlikely that any reasonable juror, properly instructed on the law, would find that Mr. Sousa or Mr. Eastridge murdered Johnnie Battle.

In the face of the new evidence summarized above, and unexpectedly tacking with the changing winds, the Government has essentially abandoned any claim that Petitioners actually stabbed and killed Mr. Battle. *But see* Respondent's Response to Petitioners' Post-Evidentiary Hearing Brief ("Respondent's Response") at 5 n.2 (stating that the Government was

---

[45] While Mr. Motlagh testified at trial in December 1975 that the green Plymouth turned left from Wisconsin onto Ellicott Street (immediately at the location where Mr. Battle was murdered), in a contemporaneous statement to the police in November 1974 he had reported that the Plymouth turned left onto Emery Place, one block north of Ellicott Street. Mr. Sousa has consistently testified that he turned onto Emery Place and Mr. Eastridge agrees. The Court concludes that a reasonable jury, with all the evidence before it, would probably find that the Plymouth turned onto Emery Place and not Ellicott Street because: 1) that was Mr. Motlagh's information at the time of the murder; 2) that was where Mr. Battle ran and was chased; 3) that was where Mr. Eastridge saw the chase go when he observed it from Wisconsin Avenue; and 4) therefore, that is where Mr. Sousa would have driven to locate the other Pagans. In addition, as discussed above, it is exceedingly doubtful that the actual murderers would have run on foot if the green Plymouth turned onto Ellicott Street.

not conceding that Petitioners were not principals in the murder based on Ms. Willetts's

testimony but failing to argue it).  Instead, through speculative factual predicates, it argues that

Petitioners had not established "actual innocence" under *Schlup* because a reasonable juror, in

light of all of the evidence, "would have found that petitioners were guilty as aiders and abettors

in the offense."  *Id.* at 4-5.  Considering the parties' arguments and all of the evidence, the Court

finds that no reasonable juror could find that Messrs. Eastridge and Sousa were guilty of the

murder of Mr. Battle as aiders and abetters.

### 1.    *Petitioners Actually Innocent of Murder as Principals*

Evidence at trial was strong that multiple persons associated with the Pagans

chased Mr. Battle, caught him, and stabbed him to death.  Evidence that Petitioners Sousa and

Eastridge chased, caught, and stabbed Mr. Battle was weak.  The knives carried by Petitioners

had no blood on them.  While Mr. Jones was covered with blood, Mr. Eastridge had no blood on

him and Mr. Sousa had a small speck.  The prosecution's major theory – that *these* four men all

chased and knifed Mr. Battle and then ended up in the green Plymouth driving down Wisconsin

soon after Mr. Richter's car – had temporal and spatial problems.  How did one or more of them

return to the car without being seen?  How did they accomplish the murder and still drive the

Plymouth south on Wisconsin so soon after Mr. Richter's car?  What happened to Jennings,

Wood, and Barber, who the prosecution had reason to believe were not being truthful?  What

about the man jogging north with the whiskey bottle?

With a more complete record, these questions now have answers.  The testimony

of Mr. Jones is now complete.  Instead of partial truths, with his role ending behind a tree, Mr.

Jones admits his complicity in the murder and affirmatively places Messrs. Jennings, Wood, and

Barber as active participants. Unhampered by the Rule, Ms. Heim testifies that Messrs. Barber and Jennings arrived at Mr. Richter's Virginia home, saying that they "got to lay low" and had run all the way from the District. Facing the previously-unrevealed Grand Jury testimony of Mr. Jennings and Mr. Wood that they had not been at the Godfather, Ms. Heim testifies that they were lying to the Grand Jury and were, in fact, present. New evidence from Michael Grayson and Raymond Lurz is that Mr. Wood admitted, in 1979, that he, Jennings, Jones, and Barber were the murderers. New testimony from Kathy Hafferman describes Chesley Barber in exactly the same attire as observed by Tommie Motlagh worn by the man with the knife chasing Johnnie Battle. New testimony from John Gianaris supports the consistent testimony of Messrs. Sousa and Eastridge that they turned left from Wisconsin Avenue onto Emery Place and not onto Ellicott, as does common sense and Mr. Motlagh's initial recollection.

Except for the turn onto Emery Place, the United States agrees that this analysis of the evidence constitutes a "reasonable inference, a reasonable interpretation of what happened . . . ." Oral Argument 4/8/05 at 22. The Court agrees. It is necessary to make a "probabilistic determination about what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. In light of all the evidence, the Court concludes that reasonable jurors would agree with the prosecutor; thus, "it is more likely than not that no reasonable juror would have found petitioner[s] guilty beyond a reasonable doubt," *id*. at 327, of actually killing Mr. Battle.

Ms. Willetts's testimony does not change this conclusion. In light of all the other evidence, new and old, that leads to the conclusion that no reasonable juror would convict Messrs. Sousa and Eastridge, one is forced to find that Ms. Willetts is not to be credited. If Mr.

Sousa and Mr. Eastridge never reached the site of Johnnie Battle's murder, as the full record indicates, it is beyond belief that they would repeatedly say that they killed him, to strangers and friends, while awaiting trial. Evidence at the 2004 Hearing that the people who allegedly heard these comments deny they ever occurred only underscored the inherent problems with Ms. Willetts's testimony once the rest of the story had been told.

## 2. *Petitioners Actually Innocent of Aiding and Abetting*

The shortcomings in the case against Petitioners were evident even to the prosecution at trial. Confronted with unanswered questions and evidentiary inconsistencies, the prosecution pressed an alternative aiding-and-abetting theory at the eleventh hour. Asserting that, even if other "phantoms" were guilty of chasing and stabbing Mr. Battle, the prosecution argued that the defendants could nevertheless be found guilty of providing material assistance to the murderers.[46]

On appeal from the trial verdict, the Government apparently changed its argument. In its brief on appeal, unlike at trial, the prosecution acknowledged the existence of other persons, arguing that two pairs of individuals ran after Mr. Battle with a third group following in a car.[47] The role that the convicted persons played, Petitioners here, had become more hypothetical and the proof of their guilt more attenuated.

In argument and briefing before this Court, the Government continues to beat a retreat from its original certainty that these Petitioners stabbed Johnnie Battle. Although suggesting in a bashful footnote that it does "not concede that petitioners were not principals in

---

[46] *See* Trial Tr. at 2782.

[47] See 2004 Hearing 12/9/04 Tr. at 84-85 (Guerrieri).

Battle's murder," the Government provides no argument to support such a finding.  Respondent's Response at 5 n.2.  Instead, it recapitulates an aiding and abetting theory of guilt that lacks a factual underpinning.

"One who aids and abets another in committing a criminal offense is chargeable as a principal for all acts committed in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural and probable consequence of the act intended." *West v. United States*, 499 A.2d 860, 865 (D.C. 1985) (internal quotation marks and citation omitted).  To convict a person of aiding or abetting another in a crime, the government must establish that: 1) the crime was committed; 2) that the defendant assisted or participated in its commission; and 3) that the defendant did so with "guilty knowledge."  *McCullough v. United States*, 827 A.2d 48, 57 (D.C. 2003);  *Smith v. United States*, 837 A.2d 87, 95 (D.C. 2003).  Participation in an offense means that the person engaged in conduct that "encouraged or facilitated the commission of the offense."  *Price v. United States*, 813 A.2d 169, 177 (D.C. 2002).  This typically requires both presence at the scene of the crime and conduct that is designed to enable the crime to succeed.  *Jones v. United States*, 625 A.2d 281, 288 (D.C. 1993).

The Government argues that "whether Eastridge chased the decedent down the street or was in the vehicle that Sousa drove in the same direction as those chasing the decedent on foot, it was the clear intent of the petitioners to pursue Battle and violently confront him . . . ."  Respondent's Response at 14.  In addition, the Government alleges that Petitioners provided assistance to the murderers when Mr. Sousa "drove in search of them" and when Mr. Eastridge "gave Jones newspaper to wrap his bleeding, cut hand . . . ."  *Id.*

Examined at its details, the Government's argument that Petitioners aided and abetted others in murdering Johnnie Battle fails. First, the original police statement given by Tommie Motlagh specifically identified the "smaller street above Ellicott St. N.W." (Emery Place) as the path taken by Mr. Battle and his pursuers and then said that he saw the green Plymouth "go in the same direction of the subjects running." 2004 Hearing Petitioners' Ex. 24 at 1. No further examination on the point was made at trial because, of course, the Government did not articulate an aiding-and-abetting theory until its closing argument. Messrs. Sousa, Eastridge, and Diamen all testified that the car turned at Emery Place. Mr. Gianaris said no car turned into Ellicott Street. Most significantly, had a car been present, Mr. Jones and one or more of the other Pagans who did murder Johnnie Battle would undoubtedly have jumped into it on Ellicott Street and not run elsewhere. The record is clear that they ran away on foot, as proved by the knife found in the back yard along the alley-way north of Ellicott Street and the arrival of Mr. Jennings and Mr. Barber on foot at the Richter home. The only evidence that puts the Plymouth at Ellicott Street is Mr. Motlagh's trial testimony, which is contradicted by his earlier statement and the rest of the record. As indicated earlier, the Court concludes that it is more probable than not that the Plymouth turned down Emery Place – where the chase had gone – and not Ellicott. Without the car on Ellicott Street, there is no basis to find that Petitioners aided and abetted the murder of Johnnie Battle.[48]

---

[48] The fact that Mr. Eastridge passed a polygraph examination that put him fifty yards from the murder scene does not bolster the Government's case. There was no evidence about this polygraph that could be deemed close to "scientific" even if polygraphs were generally admissible. *See Proctor v. United States*, 728 A.2d 1246, 1249-51 (D.C. 1999) ("Our own case law has consistently reflected an aversion to lie detector evidence."). *See also Dowd v. Calabrese*, 585 F. Supp. 430, 435 (D.D.C. 1984) ("The polygraph is not scientifically reliable."). Were the Court to credit this evidence, it would support Mr. Eastridge's claims of innocence

As passengers in the Plymouth, neither Mr. Eastridge nor Mr. Diamen could be held responsible for the fact that Mr. Sousa stopped the car and picked up Mr. Jones. *See Fields v. United States*, 484 A.2d 570, 577 (D.C. 1984) (passenger in getaway car did not have control and therefore was not guilty based merely on being in the car). But Mr. Sousa could not possibly aid and abet Mr. Jones in murdering Mr. Battle by picking up Mr. Jones one-to-two blocks away from the murder site. Without some evidence of a pre-existing plan to aid in the assault on Mr. Battle, picking up Mr. Jones and providing him with newspaper after the fact might constitute the distinct and separate crime of accessory after the fact. Such a crime is committed where a person renders assistance "to hinder or prevent the arrest of the offender after he has committed the crime. Evidence of this offense is most frequently found in acts that harbor, protect, and conceal the individual criminal such as by driving him away after he commits a murder." *United States v. Barlow*, 470 F.2d 1245, 1252-53 (D.C. Cir. 1972). *C.f. Daniels v. United States*, 738 A.2d 240 (D.C. 1999) (aiding and abetting murder where facilitation is agreed to before the crime).

The Government's suggestion that Petitioners otherwise assisted or participated in the crime is purely speculative. It is now seeking to sustain their convictions of first-degree murder, a specific intent crime, on an aiding-and-abetting theory. However, "[i]f the charge is first degree murder based upon an alleged deliberate and premeditated killing, the abettor is not guilty of this degree of the crime unless he either acted upon a premeditated design to cause the death of the deceased or knew that the perpetrator was acting with such an intent . . . ." *Hacknew v. United States*, 389 A.2d 1336, 1341-42 (D.C. 1978) (quoting PERKINS, CRIMINAL LAW at 662

since he told the examiner that he had not participated in the murder and was fifty yards (150 feet) away when it occurred. He actually "knew what happened because Stephen Jones had told me in the Baltimore jail." 2004 Hearing 12/9/04 Tr. at 32 (Eastridge).

(2d ed. 1969)).  *See also Johnson v. Gibson*, 254 F.3d 1155, 1162-63 (10th Cir. 2001);  *State v. Allen*, 2004 WL 2290483, at *4 (Mich. Ct. App. Oct. 12, 2004).  Since the Government tried the case on the theory that Petitioners were the actual chasers and killers of Mr. Battle, it introduced no evidence at trial to support the evidentiary requirement that it prove a premeditated design to aid and abet.  With a fuller record now available, the Government can still find nothing to support its argument.[49]  Even assuming that Mr. Motlagh's trial testimony is correct and that Mr. Sousa turned the Plymouth onto Ellicott Street, the evidence of the knife thrown in a back yard off the alley north of Ellicott Street demonstrates that the murderers saw no car, were not influenced by one, and ran away on foot.

Having to make a probabilistic determination, the Court concludes that no reasonable juror, properly instructed on the applicable law, would find that Petitioners were guilty as aiders and abettors.

### C.  <u>Constitutional Claims</u>

That Petitioners are actually innocent is not sufficient under *Schlup* to justify granting their Petition.  Rather, actual innocence must be accompanied by a constitutional error that probably resulted in their conviction.  Petitioners propose four.

First, Petitioners argue that the Rule limited their ability to implicate co-defendants through testimony, evidence, or argument at trial, and violated their rights under the Sixth Amendment to confront and cross-examine witnesses against them.[50]  Second, Petitioners

---

[49]  At the oral argument after post-hearing briefs, the Government acknowledged that it had no evidence beyond the disputed fact that the green Plymouth turned onto Ellicott Street.

[50]  They further propose that these limitations interfered with their ability to introduce evidence of their innocence in violation of the Due Process Clause of the Fifth Amendment.

argue that the failure of the prosecution to produce the Grand Jury testimony of Mr. Jennings and

Mr. Wood violated their right to a fair trial by denying them access to exculpatory information.

Third, Petitioners believe that they were deprived of their Sixth Amendment right to counsel due

to the deficient performance of their lawyers.  Finally, they argue that the prosecution's exercise

of race-based peremptory challenges violated their rights under the Equal Protection Clause of

the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment.

### 1.    *The Rule Violated Petitioners' Constitutional Rights*

The strategy of the individual defendants, the testimony elicited, and the evidence

parsed by defense counsel was shaped by the Rule imposed by the trial judge that barred them

from making arguments or introducing evidence through direct or cross-examination that might

"bring into play any other defendant."  Trial Tr. at 150.  Under the Rule, no defense attorney

could question any witness about matters that involved a defendant other than his own client

unless he first obtained permission from the attorney for that co-defendant.  *See id.* at 601 ("no

lawyer [is] to ask any questions that would inculpate or exculpate any other defendant unless he

cleared it with the defense attorney").

The Sixth Amendment establishes the right of criminal defendants to confront

and cross-examine all government witnesses against them.  *Van Arsdall*, 475 U.S. at 679.[51]  The

Confrontation Clause is violated when a trial court precludes a meaningful degree of cross-

--------

Petition for Habeas Corpus at 45.

[51]  The exposure of a witness's motivation in testifying is a critical function of cross-
examination.  *Greene v. McElroy*, 360 U.S. 474, 496 (1959);  *Davis v. Alaska*, 415 U.S. 308, 317
(1974).  *See Grayton v. United States*, 745 A.2d 274, 280 (D.C. 2000) (stating that exposing bias
and partiality is a proper function of cross-examination).

examination. *Springer v. United States*, 388 A.2d 846, 854 (D.C. 1978). *See Flores v. United States*, 698 A.2d 474, 479 (D.C. 1997) (right of confrontation is subject to reasonable limits imposed at the discretion of the trial judge). Whether a violation has occurred "depend[s] upon the scope of cross-examination permitted by the trial court measured against our assessment of the appropriate degree of cross-examination necessitated by the subject matter thereof as well as the other circumstances that prevailed at trial." *Springer*, 388 A.2d at 856. *See Flores*, 698 A.2d at 479 (where there is improper limitation on cross-examination, such error is of a constitutional dimension where the "error caused significant prejudice").[52] "[C]urtailment of cross-examination is rendered more severe" when a key government witness is involved; under such circumstances, "extensive cross-examination . . . [is] required to satisfy the confrontation guarantee." *Lawrence v. United States*, 482 A.2d 374, 377 (D.C. 1984).

Criminal defendants have the right to present "evidence that someone other than [themselves] committed the charged crimes . . . through the testimony of defense witnesses and by cross-examination." *Johnson*, 552 A.2d at 516 (citing *Brown v. United States*, 409 A.2d 1093, 1097 (D.C. 1979); *Stack v. United States*, 519 A.2d 147, 152 (D.C. 1986)). *See Ray v. United States*, 620 A.2d 860, 862 (D.C.1993); *Grayton v. United States*, 745 A.2d 274, 281 (D.C. 2000) (Confrontation Clause preserves "the right to present evidence that someone else committed the offense"); *Burgess v. United States*, 786 A.2d 561, 575 (D.C. 2001) (citing 1 WHARTON'S CRIMINAL EVIDENCE § 195 at 404 (13th ed. 1972)) (where the guilt of another

---

[52] Cross-examination is a purposeful trial tool that can expose falsehood and elicit truth in a criminal case. *Pointer v. Texas*, 380 U.S. 400, 404 (1965) (citing 5 WIGMORE, EVIDENCE § 1367 (3d ed. 1940)).

person is inconsistent with the guilt of the defendant, the defendant may present evidence that such other person committed the crime). Such evidence "need only tend to create a reasonable doubt that the defendant committed the offense." *Johnson*, 552 A.2d at 517. The focus is not on proof of another person's guilt or innocence, but on the effect the evidence has upon the defendant's culpability. *Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996). *See Freeland v. United States*, 631 A.2d 1186, 1189 (D.C. 1993) ("[T]he focus is properly on the reasonable possibility that someone else might have committed the crime for which the defendant stands charged and not on whether the defendant can produce proof beyond a reasonable doubt that a third person is guilty.").

 The Rule prevented effective and necessary cross-examination of key Government witnesses Pamela Heim and Dorothy Willetts. As the 2004 Hearing made clear, Ms. Heim was a witness who had observed the shooting of Bruce Hunter and the beginnings of the subsequent chase of Johnnie Battle. Ms. Heim testified before the Grand Jury that Mr. Jones was one of the Pagans who chased Mr. Battle after the shooting. At trial, however, she testified on direct examination that she did not see the chase, and Mr. Sousa's attorney was barred from cross-examining her to establish that she did not name Mr. Sousa as one of the chasers before the Grand Jury but that she had named Mr. Jones. *See* Trial Tr. at 1757-58, 1810 (Grand Jury testimony read to court outside the presence of the jury). The trial judge refused to allow this cross-examination of Ms. Heim, which was clearly exculpatory evidence for the defendants other than Mr. Jones. *Id.* at 1807, 1811. At sidebar, the trial court also specifically denied a request by Mr. Sousa's lawyer to have Ms. Heim enumerate and identify the individuals she saw giving chase. *Id.* at 1807-08. Counsel identified at least seventeen different issues on which he wished

to question Ms. Heim but was rebuffed by the court in each instance.  Among other things, counsel wanted to question Ms. Heim about the statements made by Messrs. Barber and Jennings, who had reached the Richter house on foot.  The court refused to allow this avenue of inquiry because it involved references to co-defendant Richter.  After a bench conference covering twenty-four pages of trial testimony, Pamela Heim was dismissed without one single word of cross-examination directed to her.

Likewise, the effective cross-examination of Ms. Willetts was precluded when Petitioners' attorneys were denied the right even to mention names of co-defendants to challenge her testimony.  *Id.* at 1684-92.  When Mr. Sousa's lawyer tried to cross-examine Ms. Willetts about specific conversations as they related to both Messrs. Sousa and Eastridge, he was prohibited from doing so solely because this line of questioning would involve references to Mr. Eastridge.[53]  As noted by the trial judge later, "the [R]ule proved so restrictive to Sousa's attorney that he did not even attempt any cross-examination of a witness whose sworn testimony was very damaging to his client."  *United States v. Eastridge*, 110 Wash. L. Rep. 1181, 1187 (1982).  Yet Ms. Willetts was the only person whose testimony directly implicated Mr. Sousa and Mr. Eastridge.  *Id.*

---

[53]  At a bench colloquy, counsel for Mr. Sousa protested "I am unable to cross examine these witnesses to clarify and show exculpatory information as it relates to my client . . . .  I am confounded by the reason of the fact that I cannot lay out the full fabric of the situation to the jury; not because it does not exist, not because there is not evidence to show that it does exist, but simply and completely because another defendant stands in the way of my client laying out these facts."  *Id*. at 1691-92.  Despite her highly damaging testimony and despite counsel's protest that "[t]he only technique I know for showing that [her allegations] are not factual is by cross examining her," *id*. at 1687, Ms. Willetts was dismissed without his cross-examination.

Reliable evidence, closely linking Mr. Jones to commission of the crime, included the blood evidence and the Grand Jury testimony of Pamela Heim. There was no such physical evidence or eyewitness testimony linking the Petitioners to the crime. Nevertheless, defense counsel were barred from cross-examining on those issues and were not permitted to contrast the evidence pointing to Mr. Jones with the dearth of evidence pointing to themselves. The Rule proved prophylactic in nature, if not purpose, by insulating Mr. Jones.

The Court finds that the Rule imposed an unintended but very real restriction on the defendants' abilities to shift the blame and, more importantly, provide a benign explanation for evidence that appeared to inculpate them.[54] When enforcing the Rule by limiting cross-examination – especially of Mses. Heim and Willetts – the trial court violated Petitioners' Fifth Amendment right to shift the blame to Mr. Jones or unindicted Pagans, and Petitioners' Sixth Amendment right to confront and fully cross-examine all critical Government witnesses against them.

### 2. *Failure to Release Grand Jury Transcripts Violated Brady v. Maryland*

The prosecution's failure to produce the Grand Jury testimony of Messrs. Wood and Jennings was a constitutional violation that prejudiced the Petitioners at trial. The trial record is replete with evidence that both men were present at the Godfather on November 1, 1974. Yet, they testified before the Grand Jury that they were not. The prosecution was aware of this discrepancy but did not produce the Grand Jury transcripts.

---

[54] The Government admits that the Rule "may have restricted a defendant's ability to shift blame directly to a specific co-defendant." Respondent's Response at 28 (but noting that the Rule "did not prevent any defendant from challenging the government's evidence and/or shifting blame to a nonparty"). This argument ignores the trial court's own estimate of the severity of the restriction.

Admittedly, defendants do not have a general constitutional right to discovery of all relevant evidence in criminal proceedings. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Nonetheless, there are constitutional imperatives that govern the Government's conduct in disclosing and withholding evidence. In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

The standard for disclosure in criminal cases is "materiality" which, at least in the first instance, is determined by the prosecution. Evidence is material if there is a reasonable probability that the disclosure of evidence would change the outcome of the proceeding. *United States v. Bagley*, 473 U.S. 667, 682 (1985). *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (stating that evidence is not material if, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); *id.* at 439 (the prosecution must "make judgment calls about what would count as favorable evidence").

The Government argues that "petitioners cannot show that the grand jury testimony of either Wood or Jennings is exculpatory . . . ." Respondent's Response at 36. The Court disagrees. As a general matter, false exculpatory statements can produce an inference of guilt. The combination of Ms. Heim's testimony that Mr. Wood and Mr. Jennings were present at the Godfather; that Mr. Jones was among those who chased Mr. Battle; and that Barber and Jennings ran on foot to Mr. Richter's house in Virginia, arriving distraught and wanting to hide, would have materially supported Petitioners' trial argument that the unindicted "phantoms" (no

longer phantoms, but identified persons) were more likely the murderers. Had they been aware of the false testimony, defense counsel might have presented Ms. Heim with more-particularized questions about Mr. Wood and Mr. Jennings.[55] Of course, they could also have called both men to testify and to confront their own Grand Jury testimony in an effort to show that persons other than the Petitioners could have committed the murder.

The Court finds that the Grand Jury transcripts were material and could have changed the outcome of the case. The importance of such evidence may not have been obvious to the prosecution from the start. However, when it became clear that Messrs. Jennings and Wood may have lied before the Grand Jury and when it became clear that other "phantoms" may have killed Mr. Battle, the prejudice became more acute and production of these transcripts a constitutional necessity.

### 3.    *Petitioners Did Not Receive Ineffective Assistance of Counsel*

Petitioners argue that, "[d]espite the Government's evident reliance on Willetts'[s] testimony and its damning effect, Petitioners' attorneys made no significant effort to develop evidence undercutting the Willetts testimony." Post-Evidentiary Hearing Brief at 50. They propose that through greater effort, such as that of Petitioners' counsel at the 2004 Hearing, Ms. Willetts's testimony may have been further degraded. *Id*. at 51; Reply to Government's Response at 31.

---

[55] With evidence of the Grand Jury testimony, Ms. Heim could have firmly established the actual presence of Messrs. Wood and Jennings and their false denials. The Rule would have prevented her from adding their implicating statements at the Richter house because it tended to implicate Mr. Richter. The failure of the prosecution to produce the Grand Jury testimony interfered with Petitioners' rights to exculpatory information and the Rule interfered with their rights to capitalize upon it.

A claim of ineffective assistance of counsel requires a showing that: 1) counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and 2) "the deficient performance prejudiced the defense," which requires showing that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See Kimmelman v. Morrison*, 477 U.S. 365 (1986) (ineffective assistance of counsel claim raised in habeas petition).  A court's review is "highly deferential," applying a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.[56]

Petitioners offer insufficient proof that trial counsels' efforts were constitutionally deficient.  They offer only proof that more could have been done.  *See United States v. Poston*, 902 F.2d 90, 98 (D.C. Cir. 1990) (a motion alleging ineffective assistance of counsel requires a showing of specific acts that are deficient and prejudicial).  The Court will not second-guess a defense strategy without proof that the choices of counsel were not reasonable.  *See United States v. Catlett*, 97 F.3d 565, 571 (D.C. Cir. 1996) (This Court "will not second guess reasonable choices by defense counsel.").  While more character or rebuttal witnesses may have proved beneficial, trial counsel may well have had sound strategic reasons for not introducing more evidence to counter the testimony of Ms. Willetts.  The Rule precluded even full cross-examination of Ms. Willetts, although counsel argued ably against it.  Accordingly, the Court finds that Petitioners did not receive ineffective assistance of counsel.

---

[56]  Whether counsel's performance was constitutionally-deficient and prejudicial is a mixed question of law and fact.  *Strickland*, 466 U.S. at 698;  *United States v. Weaver*, 234 F.3d 42, 46 (D.C. Cir. 2000).

    **4.**    *Batson v. Kentucky Not Applied Retroactively*

        Petitioners' claim that the prosecution used its peremptory challenges at trial to prevent any White person from becoming a member of the jury. They argue that such use of peremptory challenges is unconstitutional under *Batson v. Kentucky*, 476 U.S. 79, 80 (1986) ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."). Petitioners cannot establish improper application of peremptory challenges because they present no evidence of selective exclusion and cannot produce evidence of the racial composition of the venire. In addition, *Batson* is not applied retroactively on the collateral review of convictions that became final before its issuance. *Allen v. Hardy*, 478 U.S. 255 (1986). Accordingly, this claim must fail.

## CONCLUSION

        Finding that Petitioners have established their actual innocence and violations of their constitutional rights, the Court grants their Petition for Habeas Corpus. A separate order accompanies this memorandum opinion. The parties are directed to confer and advise the Court concerning specifics the order may require.

DATE:  May 26, 2005.               _____/s/_____
                                    ROSEMARY M. COLLYER
                                    United States District Judge